ISHAM *vs.* GIBBONS.

*In the matter of the Estate of* THOMAS GIBBONS, *deceased.*

UPON an application for letters of administration, if a will be alleged, the proceeding may be stayed, to afford an opportunity to prove the will.

The *situs* of the property regulates jurisdiction as to administration; a foreign will disposing of personalty here, must be proved here; but in taking proof, the law of the country where the deceased was domiciled at the time of his death, governs the decision as to what constitutes the last will and testament in regard to personal estate.

Whether the deceased died intestate must be determined by the law of the place where he was domiciled; and the same law governs the validity of the will, even though it has not been executed in conformity to the law of the place where it was made.

It is therefore customary, upon the production of an exemplified copy of the probate granted by the proper Court in the country where the decedent was domiciled, for the Probate Court in other countries to follow the original grant, in decreeing its own Probate.

Under the colonial government of New-York, precedents of this kind are

found of a very remote date; the practice was subsequently recognized by statute, and has been continued to the present time.

The Surrogate has jurisdiction of the Probate of a foreign will, executed in conformity to the *lex loci domicilii*, though not valid by the *lex loci actûs*.

In the provisions of the statutes relating to testamentary matters, the terms "*resident*" and "*inhabitant*" have the same purport, and are to be construed in reference to the *domicil* of the decedent.

A domicil once acquired continues till another has been gained *animo et facto*.

T. G. domiciled in New Jersey, having a dwelling and establishment there, came to the city of New-York for the benefit of his health, hired a house, and died here after two years. Held, under the circumstances, that his abode in New-York was of a temporary character, and that at the time of his death he still retained his domicil in the State of New Jersey, and that an exemplification of the Probate of his will from the proper Court in that State, should be received and recognized as valid, and be made the basis of a grant of Probate in New-York. .

MARSHALL S. BIDWELL, *for Petitioner.*
GEORGE WOOD, *for Contestant.*

THE SURROGATE. Thomas Gibbons died in the city of New-York, May, 16, 1826. His next of kin were his son William Gibbons, Hannah, the daughter of his deceased son Thomas Heyward Gibbons, and several grand-children, issue of his deceased daughter, Ann Heyward Trumbull. Ralph H. Isham, the husband of one of the daughters of Mrs. Trumbull, now applies in right of his wife for letters of administration on the estate of her deceased grandfather. The petition alleges that, at, or immediately previous to his death, Thomas Gibbons was an inhabitant of the county of New-York, that he died intestate, and at the time of his death, was possessed of personal property in the State of New-York.

William Gibbons appears in opposition to the application, and to disprove the allegation of intestacy, offers in evidence an exemplification of the probate of a will of the decedent, granted by the Surrogate of the county of Essex, in the State of New Jersey, where he claims the decedent was domiciled at the time of his death.

It appears that the deceased left assets in the city of New-York at the time of his death, and in the absence of any administration, it becomes my duty on this application, to issue letters, in case I am satisfied he died intestate. The only mode of showing that he left a will, is either by original proof of a will before me, or by evidence that a will has been duly proved before some other Court of competent jurisdiction. If the alleged will had not already been proved, it would be proper on an application for letters of administration, to stay the proceedings, until an opportunity were afforded to have the will proved in due course. Should it appear that the will has been properly proved, such probate may be directly interposed against the application for administration.

The *situs* of the property, of course, regulates jurisdiction as to the administration of the estate, which must be in the country in which possession is taken of it. (*Preston* vs. *Lord Melville*, 8 *Cl. & F.*, 1.) No will of personalty can be recognized except such, as has been or may be admitted to probate, by the proper tribunals of this State. (*Price* vs. *Dewhurst*, 4 *My. & Cr.*, 80 ; *Bond* vs. *Graham*, 1 *Hare*, 484 ; *Logan* vs. *Fairlie*, 2 *Sim. & Stu.*, 284.) . If a will be made and proved in a foreign country, disposing of personal property here, it must be proved where the assets are also. (*Taunton* vs. *Flower*, 3. *P. Wm's*, 369.) The question has been much agitated, as to the effect to be given by the Court of Probate in the country where the assets are, to the decision of the Court of Probate of the foreign country where the testator was domiciled. Whatever difference of opinion may originally have existed, as to the extent of the application of the *lex domicilii* to this class of cases, it appears now to be well established both in England and America, that the law of the country in which the deceased was domiciled at the time of his death, not only decides the course of succession as to his moveables, but also regulates the decision as to what constitutes the last will, without regard to the place

of birth, death, or the *situs* of the assets at the time. (*The Countess De Zichy Ferraris* vs. *Marquis of Hertford*, 3 *Curteis*, 468 ; *Craigie* vs. *Lewin*, *Ibid.*, 435 ; *In the Goods of Maraver*, 1 *Hagg.*, 498 ; *Moore* vs. *Budd*, 4 *Hagg.*, 346 ; *Collier* vs. *Rivaz*, 2 *Curteis*, 855.)   Even before the decision in *Stanley* vs. *Bernes*, this principle was admitted in almost its fullest extent.   "The question," said Dr. Lushington, "How far this and other Courts of Probate are to be governed by the decision of the Court of Probate where the deceased was domiciled, has never been expressly determined, but I should certainly not feel inclined to depart from what has been the general practice, unless a strong case of inconvenience were brought under my consideration." (*Larpent* vs. *Sindry*, 1 *Hagg.*, 383.) In the *Goods of Cringan*, 1 *Hagg.*, 548, the same learned Judge said in regard to a Scotch will, "had the Commissary Court at Dumfries decreed probate, I should have had nothing to do, but to follow the grant on the production of an exemplified copy."   And again in the *Goods of Read*, 1 *Hagg.*, 475, where an East Indian will, imperfectly executed according to the laws of England, was sustained, he said, "This Court however must presume that the Court of competent jurisdiction at Madras acted properly, in granting probate of this paper as a valid instrument, and had evidence before it accounting for the want of execution and other imperfections."   In *Stanley* vs. *Bernes*, Sir John Nicholl endeavored to sustain an exception to the rule, that the law of the domicil regulates the requisites to the formal execution of a will, in relation to British subjects dying abroad, but this partial inroad upon the broad doctrine was resisted and overruled in the High Court of Delegates, after a most thorough and elaborate argument by distinguished counsel. (3 *Hagg.*, 373.) In *Price* vs. *Dewhurst*, 8 *Simon's*, 299, Sir L. Shadwell thus speaks of this case : " I apprehend it is now clearly established by a great variety of cases, which it is not necessary to go through in detail, * * * that the rule of law is this : that

where a person dies intestate, his personal estate is to be administered according to the law of the country in which he was domiciled at the time of his death, *and the question whether he died intestate or not,* must be determined by the law of the same country. That has been most distinctly proved to be the rule, by the case of *Stanley* vs. *Bernes.*" Sir Herbert Jenner in commenting upon *Stanley* vs. *Bernes,* says, "The two codicils were pronounced against, on the ground that they were not executed according to the law of Portugal where the testator was domiciled, and that consequently the Court must hold that all wills disposing of personal property, situated in England, must be executed according to the law of the country where the party executing the instrument was domiciled." (1 *Curt.,* 859.) In the case of *De Bonneval* vs. *De Bonneval,* 1 *Curteis,* 856, a Frenchman domiciled in France who had resided in England for many years, executed a will in England in the English form, and in the English language, and died in England; and the Court, deciding that the validity of the will was to be determined by the law of the country where the deceased was domiciled at his death, suspended proceedings as to the will, till it was pronounced valid or invalid by the tribunals of France. In *Hare* vs. *Nasmyth,* 2 *Add.,* 25, the deceased was domiciled in Scotland, but died in London, leaving a large personal property in England. A controversy arising as to the validity of certain testamentary papers, the Court suspended its proceedings until a suit then depending in Scotland should be determined, the Judge declaring it to be his duty to pronounce according as the Scotch Courts should decide, whether the deceased died intestate, or whether the instrument propounded was a valid will.

Justice Story in his Conflict of Laws, declares it to be "a well settled principle in the English Law, that a will of personal or moveable property, regularly made according to the forms and solemnities required by the law of the testator's domicil, is sufficient to pass his personal or move-

able property in every other country in which it is situated." (§ 465.) "The same doctrine," he adds, "is now as firmly established in America, and may be deemed as of universal authority here;" § 468. (*Holmes* vs. *Remsen*, 4 *John. C. R.*, 460; *Harrison* vs. *Nixon*, 9 *Peters*, 483; *Desesbats* vs. *Berquier*, 1 *Binney*, 336.) "Foreign jurists are as generally agreed, as to the doctrine in regard to moveables, upon the ground maintained by all of them, that *mobilia sequuntur personam.*" (§ 470.) This rule reaches, also, the requisites to the due execution of wills and testaments, the proofs of which must and ought to be according to the law of the domicil of the testator (§ 630, *b*). "In regard to wills of personal property made in a foreign country, it would seem to be almost a matter of necessity, to admit the same evidence to establish their validity and authenticity abroad, as would establish them in the domicil of the testator." (§ 636.) The same principle has also been applied to the construction of wills, which, as to personalty, are to be construed according to the law of the domicil. (§ 479, *f*.) Thus a native of Scotland, domiciled in England, executed during a visit to Scotland, and deposited there, a will prepared in the Scotch form. It was held that the will was to be construed according to the English law. (*Anstruther* vs. *Chalmer*, 2 *Simons*, 1; *Yates* vs. *Thomson, et al.*, 3, *Cl. & Fin.*, 544.)

I have dwelt somewhat at length upon the authorities relating to this point of the case, for the purpose of illustrating the usual course of Courts of Probate in regard to foreign wills, entirely independent of any statutory regulations. Indeed, in England the adhesion to the law of domicil has been carried so far, that in cases of intestacy it is the custom to grant administration, in the very teeth of the statute, to the person entitled to the effects of the deceased according to the law of the place where he died domiciled. (*In the Goods of Beggia*, 1 *Add.*, 340; *Countess Da Cunha*, 1 *Hagg.*, 237; *Stewart*, 1 *Curt.*, 904; *Dormoy*, 3 *Hagg.*, 767; *Rogerson*, 2 *Curt.*, 656; *Johnston*,

4 *Hagg.*, 182.)   And in carrying out the doctrine with regard to wills, " it has been the practice," says Williams in his Treatise on Executors, " upon production of an exemplified copy of the Probate, granted by the proper Court in the country where the deceased died domiciled, for the Prerogative Court here to follow the grant, upon the application of the executor, in decreeing its own probate." ( *Viesca* vs. *D'Aramburu*, 2 *Curt.*, 277 ; 2 *Cases, Lee*, 358 ; *Wm's on Ex'rs*, 308 ; *Goods of Rioboo*, 2 *Add.*, 461.)

Indeed, having once attained the position that the law of the domicil of the deceased is to prevail, it is difficult to see how any Court of Probate could well adopt any other rule.   The foreign decree of course does not govern *proprio vigore*, but is received as evidence, and is admitted not only *ex comitate*, but for reasons of convenience, as in general affording the most ready, safe and certain mode of ascertaining that law, which is to decide the validity of the instrument.

I have, by express provision of statute, exclusive jurisdiction to take the proof of the last will and testament of any deceased person, not an inhabitant of this State, dying in this county, and leaving assets herein.   On the return of the citation to the widow, and next of kin, instead of an original will being produced, and witnesses examined, should an exemplification of the probate of a will by a Court of Probate of the State or country where the deceased was domiciled, be offered in evidence before me, would I not be bound to receive it as the highest evidence of a valid will ?   Once having acquired jurisdiction of the subject matter, it seems to me clear that I should be governed by those universal rules, which in the application of the *lex domicilii* to testamentary cases, have been recognized by sound and enlightened jurists, and have been received with approbation by Courts of justice, especially in that country from which we derive our laws and system of jurisprudence.

Nor do I think, that the existing statutes of this State

tend to restrain me, in the exercise of this judicial power. Under the colonial government, when the probate of wills was vested in the Governor or his delegates, I find that so far back as the time of Lord Cornbury in 1708, probate was granted of a Connecticut will, on an exemplification of probate from that province. By the statute of February 20, 1787, it was declared that wills of persons not inhabitants of this State, might be proved before the Judge of the Court of Probates, and before no other person, " *in the manner heretofore used.*" (1 *Greenleaf*, 366.) By the Act of March, 27, 1801 (*K. & R.*, 1, *p.* 317), the power of taking proof of such wills " *in the manner heretofore used*," was distinctly extended to Surrogates (1 *R. L.*, 449) ; and from that time to the present, the practice has been uniform to issue letters testamentary or of administration, on the production of an exemplification of the foreign decree of probate.

The mistake was made at the adoption of the Revised Statutes, of not effectually providing for the proof of foreign wills affecting real estate in this State. The Surrogate had jurisdiction to take the probate, but he was paralyzed in its exercise, by want of authority to issue a commission to examine foreign witnesses. The sixteenth section of the act of 1830 (*Laws of* 1830, *ch.*, 320), was designed to cure this defect. " There was no provision in the old statute," say the revisers, " nor is any contained in the new, relative to the proof of foreign wills. The above sections will remedy the omission in a manner, which, it is believed, will be entirely safe." (3 *R. S.*, 2*d* *ed.*, *p.* 634.) By the term " foreign wills," it is manifest, the revisers intended only such wills, as, from the witnesses residing abroad, must be proved abroad ; for the statute had made very distinct and exact provision for proof of wills before the Surrogate, where the witnesses resided here, in every case where real or personal property in this State was devised or bequeathed. As to wills of real estate, of course they must be proved to have been executed according to our laws, and even as

to wills of personal estate, there might be frequent cases, in the absence of a foreign probate, of taking directly the testimony of witnesses residing out of the State. The first five sections incorporated in the Revised Statutes, by the amendatory Act of 1830 (2 *R. S.*, 3*d* ed., § 78, 79, 80, 81, 82), authorize the Chancellor to issue a commission for the purpose of examining foreign witnesses to a will, and regulate the mode of probate. These sections relate, however, exclusively to wills executed according to the laws of this State. Had a stop been made at this point, no difficulty would have arisen. But the next section proceeds to authorize the proof of wills of personal estate, " duly executed by persons residing out of this State, *according to the laws of the state or country in which the same were made ;*" it empowers the Chancellor to take proof of such wills under a commission; and declares, in addition, that the Surrogate may, in such cases, issue letters testamentary or of administration with the will annexed, upon the exemplification of the foreign probate. It is added, however, that " no will of personal estate, made out of this State, by a person not being a citizen of this State, shall be admitted to probate under any of the preceding provisions, *unless such will shall have been executed according to the laws of the state or country in which the same was made.*" It would thus follow, unless the Surrogate had jurisdiction to take proof of the wills of persons, not inhabitants, under the previous general provisions of the statute, that there existed no mode, after the adoption of these new sections, of proving a will of personalty, of a testator domiciled abroad, executed according to the law of his domicil, but *not* according to the law of the place where he may accidentally have executed it. Thus, a will made in Virginia by a citizen of Ohio, temporarily absent from his home, though valid by the law of Ohio, his place of domicil, and duly admitted to probate there, could not be proved in New-York under these special provisions, unless it was executed in conformity to the laws of Virginia, where it chanced to

be made. This feature did not escape the attention of the late Chancellor. In the matter of *Catharine Roberts' will*, 8 *Paige*, 519, he remarked, that the amendments incorporated in the Revised Statutes, by the Act of 1830, " do not necessarily exclude the idea, that a will of personal property made by a testator domiciled abroad, may be valid if executed according to the law of his domicil, although the form of its execution is not in accordance with the law of the place where he actually executed it, during a temporary absence from his place of residence. But," he adds, " the mode of proving such a will here, if it is valid, as I think it would be, must be different from that which is provided by these special provisions of the Revised Statutes, relative to foreign wills, and this Court has no jurisdiction in such a case."

As I have already shown, the jurisdiction in such a case has always been with the Surrogate, having been conferred in the general authority to take proof of wills of non-inhabitants, where assets have been left, or have come in his county. The means of exercising it, however, were not at the first provided. In this connection, it is worthy of remark, that the entire course of legislation since the adoption of the Revised Statutes, has looked rather to an enlargement than a diminution of the authority of the Surrogate. Thus, the provision which prohibited Surrogates, " under pretext of incidental power or constructive authority, from exercising any jurisdiction whatever, not expressly given by some statute of this State," was repealed in 1837. (*Laws of* 1837, *p.* 536, § 71.) Under the Colonial Government, the Governors were Judges of the Prerogative Court, or Court of Probate, and the Surrogates were their deputies, acting, of course, in conformity to the system prevailing in the Ecclesiastical Courts of England. By the Act of 16 March, 1778, Surrogates were recognized, and by the Act of 1801, they were expressly authorized to take proof of foreign wills, " *in the manner heretofore used;*" an undoubted reference to the usage previously

prevailing. I may add, that since the repeal of the section of the statute, prohibiting the exercise of any jurisdiction not expressly given, the exercise of powers not enumerated in the statute, has been sustained and commended by the Appellate Court. (*Vreedenburgh* vs. *Calf*, 9 *Paige*, 129; *Skidmore* vs. *Davies*, 10 *Paige*, 318; *Procter* vs. *Wanmaker*, 1 *Bar. Ch. R.*, 302.) The 77th section of the Act of 1837, authorized the Surrogate to issue commissions for the examination of witnesses abroad, in the same manner as Courts of Record, thus enabling foreign wills to be proved before him, in all cases, without resorting to the aid of the Court of Chancery, under the amendments of the Act of 1830. A will of personalty, valid according to the law of the domicil of the testator, but not valid according to the law of the place where it was made, may now, therefore, be proved before the Surrogate, under a commission issued for the examination of foreign witnesses. I think this completes the power of this Court, in relation to the probate of foreign wills, in all cases whatever, without reference to any special statutory provisions. There is here, both jurisdiction to take the proof, and the means of taking it.

Were this otherwise, still I am of opinion, that the statutes confer sufficient authority, to issue letters testamentary upon the production of a foreign decree of probate, in every case of a non-inhabitant, except one. The amendments of 1830, permit it in regard to wills made by persons "residing out of this State," and executed according to the laws of the State or country in which they were made; and the 2*d section of the Act of* 1840, *ch.* 384, permits it in regard to wills executed in this State by persons residing out of the State. Wills executed abroad according to the *lex domicilii*, but not according to the *lex loci actus*, are the only cases not in terms reached by the statutes.

In the present controversy, it is contended that Thomas Gibbons was a resident, at the time of his death, of the city of New-York, and on the supposition that the matter is to be

entirely controlled by the second section of the Act of 1840, it is insisted that he does not come under the class of "non-residents," whose wills by the terms of that section, I can admit to probate on the production of a foreign decree. I have already intimated that in my judgment, I have a right to receive a foreign probate in evidence, where the deceased was domiciled abroad, independently of the statutory declarations. But I think the Act of 1840, justly interpreted, meets the present case, and I prefer not to put it upon any constructive authority.

The question is, as to the meaning of the term, "not a resident of this State." If Thomas Gibbons was "not a resident" of the State of New-York, the foreign probate is evidence of his testacy. On examining all the statutes in relation to the proof of wills, it will be found that the term originally used to distinguish domestic from foreign testators, is "inhabitant." The word "resident," first crept into use, at the time the amendments, by the Act of 1830, were adopted. If resident does not mean the same as inhabitant, then the term is anomalous in the statute. It was probably used with more freedom, as synonimous with inhabitant, in consequence of the language of the Court, in the case of *Roosevelt* vs. *Kellogg*, 20 *Johns. R.*, 208. That was a question arising under the insolvent act, which required the insolvent applying for a discharge, to be "an inhabitant," and it was held that a resident and an inhabitant were the same. In the matter of *Wrigley*, 4 *Wendell*, 602, a case also arising under the insolvent law, the Court held, that a foreigner who had resided here for seven years and then departed for England, uncertain whether he would return or not, lost his character of an inhabitant. In the same matter, 8 *Wendell*, 140, the Chancellor says, "Inhabitancy and residence, do not mean precisely the same thing as domicil, when the latter term is applied to succession to personal estate; but they mean a fixed and permanent abode, or dwelling-place for the time being, as contradistinguished from a mere temporary locality of existence.

In the case of *Roosevelt* vs. *Kellogg*, the Supreme Court decided that the term inhabitants, in this statute, meant the same thing as residents. It unquestionably means the same thing as *incolæ*, or sojourners, as distinguished from *advenæ*, transient persons or strangers."

In the matter of *Thompson*, 1 *Wendell*, 45, which came up under the non-resident debtor act, the Court said in regard to the debtor, " The question is, where was his actual residence, not his domicil. The act is intended to give a remedy to creditors whose debtors cannot be served with process. The reason why this remedy is given against the property of debtors resident abroad, is equally applicable, whether the debtor is absent permanently or temporarily. No length of residence without the intention of remaining, constitutes domicil. A debtor, therefore, by residing abroad without declaring an intention to remain, might prevent his creditors from ever collecting their debts."

In *Frost* vs. *Brisbin*, 19 *Wendell*, 11, the question arose under the act to abolish imprisonment for debt. It is there said, " the domicil of a citizen may be in one State or territory, and his actual residence in another." " In *Roosevelt* vs. *Kellogg*, a resident of a place is said to be synonymous with an inhabitant, one that resides in a place. It may, I think, be doubted if this position is strictly accurate, as the latter term implies a more fixed and permanent abode than the former, and frequently imports many duties and privileges, which a mere resident could not claim or be subject to. Approved lexicographers, give a more fixed and definite character to the place of abode of the one, than the other."

All of these cases, it will be observed, relate to statutes regulating the rights and remedies of creditors, and the decisions have generally leaned to a liberal construction of the law in favor of the creditor. One of them expressly, and all of them virtually decide, that actual residence without regard to the domicil, was within the contemplation of the particular statutes which were the subject of in-

11

terpretation. I have not been referred, however, to any authority which tends to show, that in statutes relating to testamentary matters, the word inhabitant or resident, is to be construed in a limited sense, so as to mean actual residence in contradistinction to domicil. All words are capable of being taken in a strict, or a liberal, or a loose sense. Even in relation to statutes which have manifestly been intended to give remedies to the creditor where his debtor was not an actual resident, there has been enough discussion, as to the meaning of the term, a fact quite significative of the various interpretations it may receive. So far as our own Constitution and laws speak of residents, the idea of a fixed and permanent dwelling generally seems to be involved. Thus, in the qualifications of citizenship, and in the laws relating to taxes, the militia service and the settlement of the poor, residents and inhabitants, are mentioned as convertible expressions. In Massachusetts, the Judge of Probate is authorized to take the proof of wills of persons deceased, " inhabitants of or residents in the same county, at the time of their decease." In *Harvard College* vs. *Gore*, 5 *Pick.* 372, the question arose, whether the testator was an inhabitant of the county of Suffolk, or of the county of Middlesex. Chief Justice Parker says, " Many aliens reside for years within the commonwealth, without becoming inhabitants of any town or county, for the term inhabitant imports many privileges and duties which aliens cannot enjoy or be subject to." The Judge then proceeds to argue the question of domicil, and continues, " But we think that without reference to the law of domicil, the true construction of our own statute will settle the question in the present case. The term inhabitant, as used in our laws and in this statute, means something more than a person having a domicil. It imports citizenship and municipal relations ; whereas a man may have a domicil in a country to which he is an alien, and where he has no political relations." " An inhabitant by our Constitution and

laws, is one who being a citizen, dwells or has his home in some particular town, where he has municipal rights and duties, and is subject to particular burdens, and this habitancy may continue, notwithstanding an actual residence in another town or another county." "The constitutional definition of habitancy is the place where a man dwells, or has his home, in other words his domicil."

We thus see the large capacity of the words under discussion. An evidence of the changes attending the use of the term residence, cannot be better exemplified than in a sentence from the opinion of Justice Spencer, in *Elbers* vs. *The United Insurance Company*, 16 *Johns. R.*, 133 ; "The fact," he says, " of a person residing in a country for a considerable period, leads to the conclusion, that he has adopted it as his residence." The learned Judge, it is clear, first speaks of actual residence, and then infers from its continuance, permanent residence, using the expression as a synonym of domicil. So, also, in *United States* vs. *The Penelope*, 2 *Peters. Ad. Dec.*, 438, it is said, " an inhabitant or resident, is a person coming into a place with intention to establish his domicil or permanent residence, and in consequence, actually resides." The term domicil seems to possess quite as much elasticity as residence ; for though there can be but one principal domicil for cases of testacy or intestacy, yet there may be two or more domicils for different purposes, such as a domicil of allegiance, a political, matrimonial, commercial or forensic domicil. (*Phillimore's Law of Dom.*, 19 ; *Stephenson* vs. *Langston*, 1 *Hagg.*, 379.) A person may be " an inhabitant for one purpose and not for another," says Justice Parker, in the case already cited. "It cannot, therefore, be too carefully recollected," observes Phillimore, " that domicil is distinguished by the various situations to which it is applied, that is to say, the circumstances which will be of force sufficient to impress the character of a domicil in one instance, will fail to do so in another ;" and he adds, with just discrimination, " It might perhaps have been more correct, to have

limited the use of the term domicil, to that which was the principal domicil, and to have designated simply as residences, the other kinds of domicil; but a contrary practice has prevailed, and the neglect to distinguish between the different subjects to which the law of domicil is applicable, has been the chief source of the errors which have occasionally prevailed on this subject."

The extension of this remark to the words inhabitant and resident, will, I think, lead to the solution of the apparent difficulties, which have embarrassed the subject. These expressions should be construed in connection with the matter to which they are applied. In statutes designed to give creditors prompt remedies against absent debtors, it is just to consider the word resident as meaning an actual resident merely. In provisions relating, however, to testamentary cases, which depend upon the law of domicil, it is equally rational to construe the term in consonance and harmony with the established rule of law, rather than to indulge the supposition, that the Legislature intended, by a provision evidently designed to facilitate the proof of foreign wills, to override the law of domicil. The section of the statute under consideration, authorizes the reception of a foreign probate, in the case of a will made by a nonresident in this State. If residence here, means only actual, naked residence, and not a permanent and fixed abode, or domicil, it is clear that a testator may have been domiciled here, and have made his will here, even though he actually resided abroad, for a man may have his domicil in one place and his mere residence in another. The consequence of such an interpretation of the section, would be, that a testator domiciled here, and making his will here, but residing for the time elsewhere, could have his will proved here on the mere production of a foreign probate, whether the will did or did not conform to the law of this State. I cannot think an interpretation of this section sound, which might lead to such results; but on the contrary, it would appear to be the most just and consistent construction of the pro-

vision, to hold it as intended to sanction the probate of a will made in this State, by persons permanently residing or domiciled abroad, on the production of the decree of a Court in the place of the domicil of the testator.

With this view, it remains to determine, whether Thomas Gibbons, at the time of his death, was domiciled in New-York, or in the State of New Jersey. It seems to be conceded, that before coming to this city, in 1824, his permanent residence was in New Jersey. The State of Georgia was his domicil of origin, but he had removed to New Jersey, where he had established himself, and had continued for several years. Now, it is well settled, that a domicil once acquired, continues until the party has acquired another *animo et facto*, by indicating and carrying into effect the intention of abandoning his former domicil, and taking another as his sole domicil. (*Somerville* vs. *Somerville*, 5 *Vesey*, 787.) The exact time Mr. Gibbons took up his residence in New Jersey, does not appear; but I infer that it occurred, at least, as early as 1813. In the language of Dr. Anderson, who found him "settled at Elizabethtown, he had there the establishment of a gentleman, grounds around him, servants, carriages, &c." In the year 1824, he came to the city of New-York, where he continued for about two years, till his death, May 16, 1826.

To show that he had abandoned his residence or domicil in New Jersey, the applicant has given in evidence, that the decedent hired and lived in a house at the corner of Beach and Hudson streets in this city, where he died. This house was furnished, and was occupied by him and his servants alone. His name was in the city directory for the year 1825, and he was rated for and paid taxes the same year on $100,000, personal property. His remains were first deposited in a public vault in New-York, and afterward removed to Georgia. This is the substance of all the testimony on that side of the case except that which is documentary; and laying aside the fact of paying taxes, it established only the single fact of actual residence

in this city for about two years, in a hired house, and death in the same place. The tax assessment, and the insertion of the name in the directory, grew out of the occupancy of a dwelling house. The removal of his body to Georgia, whatever may be its effect on the relative claims of Georgia and New Jersey to be considered the domicil, at any rate, points away from New-York. His death here is also of no consequence. That is always an event which depends upon other laws and circumstances, than such as indicate the domicil of the party. As to the documentary testimony, it is of a more serious character. It shows, that on October 29, 1825, the deceased described himself in a deed of manumission, as " of the city of New-York." In his will, dated, Oct. 26, 1825, he describes himself as " at present of the city of New-York in the State of New York, but late of Elizabethtown in the State of New Jersey, and formerly of Savannah in the State of Georgia;" speaks of his residence there, as " my Rose-Hill farm whereon I formerly lived, which includes a lot opposite the dwelling house lately occupied by me;" and again calls it, " my above-mentioned dwelling house." I think all the substantial facts on the part of the applicant are resolved into,

1. Actual residence for two years ; 2. Payment of taxes ; 3. Documentary declarations.

On the other side, it appears that the house where the decedent lived was hired by the year ; that during the period he occupied it, it was sold at auction, and he had an opportunity, if desired, of holding it permanently, but his son, who hired it for him, was in the auction room at the time of sale, and told the purchaser he did not wish to buy the house for his father for a permanency, and his father only wished it for a time. It further appears, that on this house being taken, directions were given to have only part of it cleaned ; cheap carpets were laid down without binding, the basement was not occupied, the parlors were plainly furnished, and in the second story there

were only beds for the servants. For the purpose of furnishing it, some furniture was moved from the upper part of the house in New Jersey, some of which, not wanted for use, was sent back. While here, the decedent was confined to his house, riding out occasionally only during the first period of his sickness, in a hired carriage.

In explanation of the purpose for which he came here, Dr. Anderson, his physician, testifies that he attended him at Elizabethtown a year before he left, that he came to New-York in consequence of his illness—an attack of paralysis—to have more efficient, and better medical attendance, and to secure the daily attendance of Dr. Post, a physician of eminence. With this statement of Dr. Anderson, other witnesses agree, and there is nothing to contradict it.

As to the probable period of his stay, and his intention of remaining in New-York, or returning to New Jersey, Dr. Anderson states that he does not remember as to any definite time he was to remain here. His impression, derived from conversation with the decedent, was that on his restoration to health, he would return to New Jersey. During the first part of his sickness, he held out to him expectations of improvement. To Samuel Dawes he called Elizabethtown his home, and spoke of returning there when he got better. To Eliza Coles, on going into the house in New-York, he said he did not know how long he should stay there ; it might be for two or three months ; that he would stay as long as his physicians should think proper. Again he told her that he came to New-York on account of his health, and to be near his medical attendants ; that he intended to return to Elizabethtown ; that he did not wish any furniture in New-York except what he wanted to use. To George L. Bennet he said, that as soon as he got well enough he was going back to Elizabethtown ; that his design in coming here was to get near a good physician. Maria Van Cott, a servant in the house with him here, says, she recollects well he was going back

to New Jersey, because he asked her a great many times to go there and live with him. She adds, that he often spoke of returning to New Jersey.

In regard to his dwelling at Elizabethtown, where he had previously lived, it appears that the establishment was kept up, after Mr. Gibbons' departure, in the same manner and style as before. There were several servants there, a horse, wagon, and carriage ; and, in fact, little if any alteration occurred after his departure.

This appears to me to cover the material testimony on both sides, except that relating to the payment of taxes. The tax assessor states that the decedent was dissatisfied with the assessment, maintained that he had no property in New-York that was taxable, that he was here for the purpose of receiving medical attendance, and did not consider himself a resident. The assessor adds, that they assessed him as a resident, on the ground that the hiring and occupying a house made a personal residence. In *De Bonneval* vs. *De Bonneval*, already cited, the Court declared a disinclination to pay attention to the descriptions of the deceased in legal proceedings in France ; or the exercise of political rights in that country; or his being registered as a voter in England. Being a housekeeper, he was registered there as a matter of course. The Court then continues : "It is stated that he resisted with success the contribution to some of the French rates which a person resident in France was liable to, but the grounds are not stated, and it is too loose a reasoning, that because all French subjects are liable to such rates, and he successfully resisted them, therefore he was not domiciled in France. It must be shown that the question came regularly before the French tribunals, and he was held not to be a domiciled subject of France." In the French Courts, the payment of a capitation tax has been held not to affect the question of domicil. (*Phillimore*, 73.) Rush, in *Guier* vs. *O'Daniel*, 1 *Binney*, 349, says, "It is, I think, extremely doubtful, whether voting and paying taxes are in any case necessary to con-

stitute a domicil, which being a question of general law, cannot depend on the municipal regulations of any state or nation." (1 *Binney*, 349.)

I should certainly not be justified, either in surrendering my judgment in the present case to that of the assessor of taxes, or in drawing an inference from the payment of taxes by the deceased, as to his residence here, when the payment was in fact resisted, in the first instance, and the tax was levied not only under a protest against its legality, but with a declaration on the part of the deceased, quite sufficient to destroy any implication to be deduced from the payment. The assessor furnishes evidence, from a source entirely independent of the ordinary familiars of the deceased, that he came here for the purpose of his health, and did not esteem himself a resident.

This leaves the case, on the part of the applicant, entirely on the fact of naked residence, and the documentary descriptions by the deceased.

The naked residence in itself amounts to nothing, unaccompanied with evidence of the *animus*. But in view of the facts on the one side, that the house in New-York was hired from year to year, was partially and plainly furnished, and apparently only for a temporary purpose; while, on the other hand, his dwelling at Elizabethtown was kept up in the same style as previously, I should, without going further, be unable to draw any inference from the residence in New-York, of a change of domicil; for under such circumstances, the residence in New-York would not be inconsistent with the domicil in New Jersey.

The counsel for the applicant argued, that, even if the deceased came to New-York without any definite purpose of remaining here ; as time passed, and hope of recovery was abandoned, the New Jersey domicil was abandoned. But there is a clear distinction between the surrender of a hope of ever being able to return to your home, and the absolute abandonment of your home. Many an invalid leaves his bones upon a foreign soil, who,

12

after a long absence from home, has given up the prospect of a return, and yet who has not taken the first step towards the surrender of his domicil. In the case of *Cragie vs. Lewin*, 3 *Curteis*, 448, one of the questions of fact was somewhat analogous to this. "The important point," says Sir Herbert Jenner Fust, "is, what is necessary to constitute a change of domicil. There must be both *animus et factum;* that is the result of all the cases." "The principle extracted from all the cases is this, that a domicil once acquired, remains, until another is acquired, or the first abandoned." "The question is, whether a person having a fixed domicil, and having quitted it, with the proposed intention of returning, although such intention may be annulled by the happening of a particular event, can by law be said to have abandoned that domicil. This is the important part of the case. Did the deceased, when in 1837 or 1839 he went to Scotland, go there *animo manendi*, or did he merely go there to remain so long as the rules of the service would permit, and no longer?" The same learned judge in *De Bonneval* vs. *De Bonneval*, said: "The acquisition of a domicil does not simply depend upon the residence of a party. The fact of residence must be accompanied by an intention of permanently residing in the new domicil, and of abandoning the former. In other words, the change of domicil must be manifested *animo et facto*, by the fact of residence, and the intention to abandon." "The *onus* of proving the change is on the party alleging it (the presumption of law being, that a domicil once acquired, subsists until a change is proved), and this *onus* is not discharged by merely proving residence in another place, which is not inconsistent with an intention to return to the original domicil, for the change must be demonstrated by fact and intention."

In the residence at New-York, then, I can see nothing tending to show that the deceased had acquired a new domicil here. The declarations of the deceased in his will, and in the deed of manumission, furnish the only evidence

pointing to such a conclusion. In a nicely balanced case they might be decisive, but great caution should be used in not giving them too great weight, or attaching to them a meaning not designed by the testator. In *Jennison* vs. *Hapgood*, 10 *Pick.*, 77, much stress was laid upon the deceased describing himself of a certain place, in his will; but the description was in harmony with other controlling circumstances, and the Court admit that such a description is not conclusive. In *Moore* vs. *Budd*, 4 *Hagg.*, 346, the will began: " I, Thomas Moore, born at Alicant in the kingdom of Spain, but a subject of his Britannic Majesty." It was also shown that the deceased never would take the character of a Spanish subject, and yet he was held to be domiciled in Spain. On looking at the written declarations of Mr. Gibbons, they may receive a meaning in ordinary parlance, as descriptive of his present residence, without being supposed to have been designed by him to relate to his legal domicil. The expressions, indeed, seem to refer rather to the present local existence of the writer, than his domicil. Thus he speaks of himself as at present of the city of New-York, but late of Elizabethtown,—of his Rose-Hill farm, whereon he formerly lived,—which is all true in a sense quite consistent with a retention of his home there. Again, he refers to the dwelling house "lately occupied by me," when, except in physical presence, it was still in fact occupied by him, in every substantial import of the term; and shortly after, he refers to it again, as, "my above-mentioned dwelling house," in a mode suggestive of its still being his dwelling house. The truth is, after all, that such written declarations, even of the most solemn character, are but facts to enable the Court to discover the intention of the party. It is in this light alone they are to be received and weighed. At the best, the *animus* of the party is only to be *inferred* from them. In this respect they are like any other facts. Declarations of any kind are not controlling, but may be, and frequently are, overcome by other and more reliable indications of the true

intention.  In the present case, the preponderance of testimony is so clearly against a New-York domicil, that it outweighs, in my judgment, the descriptions of the deceased in his will, even giving them all the deliberative character claimed for them.

At this period of time, I should feel inclined to place little, if any, reliance upon the oral statements of the deceased, were they in opposition to the general tenor of the other facts in the case; but taking them in connection with the statement of the assessor, and that of the owner of the house, the temporary character of the establishment here, the removal of the decedent after being taken sick, and the preservation of his establishment in New Jersey, I am disposed to think his declarations made to his physician contemporaneously with the act of coming to New-York, and his conversations with others as to his object, furnish the most conclusive evidence that he came here for a special and temporary purpose.  In three cases, the having a house in London, has been held in the English Courts to be perfectly consistent with a Scotch domicil.  This fact existed in *Somerville* vs. *Somerville*, *Warrender* vs. *Warrender*, 2 *Clarke & Fin.*, 520, and *Munro* vs. *Munro*, 7 *Cl. & Fin.*, 881.  An important criterion in all cases of double residence, has been the existence of a mansion house, against which a mere habitation or dwelling house elsewhere is held to be of little force. (*Phill.*, 85.)  Which is the stronger fact of the two, the possession and ownership of a dwelling house and establishment occupied for years, in New Jersey, or the renting and occupation of a house imperfectly fitted up, in New-York, from year to year?— the one in the place of domicil, ready for a return of the owner, and the other ready to be surrendered at the shortest customary period?  In addition to this, the declarations of the deceased of his intention to return, on recovering his health, are so entirely consistent with the other features of the case, that I cannot discard them.  Nor do I see how I can overturn the concentrating force of all the

facts in evidence, by the descriptions of the deceased furnished in the deed and will, which, indeed, I think are susceptible of a plain, ordinary reading, in harmony with the doctrine of what may be called a double residence, and a single domicil, or of a single, actual residence in one place, and a domicil in another.

The sum of this is :

1. That the law of the domicil, regulates the decision as to what constitutes the last will, without regard to the place of its actual execution.

2. That the foreign decree is generally received as evidence in proof of the foreign will.

3. That the Surrogate has jurisdiction of foreign wills and the means of taking probate of them, independent of the special provisions of the Act of 1830.

4. That the recognition of the *lex loci actûs*, is confined to proof of wills taken under those special provisions.

5. That the words inhabitant and resident as used in the Revised Statutes, and the amendments of 1830 and 1840, are not to be construed in derogation of the law of domicil, but in harmony with it.

6. That if Thomas Gibbons, at the time of his death, was domiciled in the State of New Jersey, an exemplification of probate of his will from the proper Court in that State, should be received in evidence here.

And, finally, that the decedent was so domiciled, and probate of his will having been produced, I find that he did not die intestate, and must deny the application for letters of administration.

Before concluding, I think it proper to state, that I have not considered the documents offered in proof, relating to the ejectment suit tried in the Supreme Court of New Jersey. A verdict in an action brought for the purpose of trying the validity of a will, as to realty, is never admissible in an allegation in a testamentary cause respecting the same will in the Ecclesiastical Court. This point has been expressly decided. (*Grindall* vs. *Grindall*, 3 *Hagg.*, 259.)

As to the proof of the will in New Jersey, some state-ments were made by Mr. Trumbull, which seemed to point at a want of notice or service of process on the parties in interest. But as this was not pressed, I take it for granted, that at that period, wills were proved there by what in England is called the Common Form, without notice to any of the parties. The same course was pursued in this State before the Revised Statutes; and if the will had then been proved here, it might have been done without notice in fact to the next of kin.