Matter of the Application of BENJAMIN EASTMAN HAR-
WOOD to Have Issued to Him Ancillary Letters Tes-
tamentary on the Last Will and Testament of
REBECCA TONNELE RICE GAY, Deceased.

(Surrogate's Court, New York County, October, 1918.)

Wills — when, deemed to be " established " — when application for ancil-
lary letters granted — Code Civ. Pro. § 2629.

Where decedent while a resident of France made a mystic
or secret will there in accordance with French law, and in the
presence of six witnesses delivered it to a notary who enclosed
it in a sealed envelope on the outside of which said witnesses
signed their names, and after the death of testatrix the notary,
who had retained the will, and the witnesses appeared before a
French court of competent jurisdiction where the will was duly
proved and recorded, and it appears that the decedent left
assets in New York county, the will will be deemed " estab-
lished " within the meaning of section 2629 of the Code of
Civil Procedure and the application of the universal legatee
under the will for ancillary letters will be granted upon con-
dition that the petitioner give a bond in the value of the per-
sonal property in this state.

A next of kin of testatrix who has instituted a proceeding in
the French courts to have the will declared invalid upon the
ground of want of testamentary capacity, which proceeding is
still pending, has a right to intervene in the proceeding to
obtain ancillary letters.

APPLICATION for ancillary letters.

Wentworth, Lowenstein & Stern (Julian A. Gregory,
Allen S. Wrenn and Bertram L. Marks, of counsel),
for Benjamin E. Harwood.

Ehlermann, Wright & Abbott (George L. Ingraham
and Julian M. Wright, of counsel), for intervenor.

FOWLER, S. This is an application for ancillary letters. The petitioner alleges that he is a citizen of the United States domiciled in Connecticut; that the deceased died in France, leaving a will which was duly established in accordance with the laws of France, and in which he is named as universal legatee, and that under the law of France he is entitled to take into his possession the personal property of the deceased wherever situated. He further alleges that the deceased left personal property in this county. Subsequently to the filing of the petition for ancillary letters Anna Von Wernstedt, one of the next of kin of the deceased, made application for permission to intervene in the proceeding, and filed objections to the jurisdiction of this court to grant ancillary letters on the estate of the deceased. She also asked that this court require the petitioner to commence *de novo* proceedings to probate the will of the deceased in this state. The attorneys for the petitioner then made a motion to strike from the record the notice of appearance filed by the attorneys for Anna Von Wernstedt and their objections to the application for ancillary letters. They also moved to strike out all of the papers annexed to the petition of Anna Von Wernstedt for leave to intervene and to dismiss her petition upon the ground that it is insufficient in law.

From the papers submitted to me in the proceeding it appears that Rebecca Tonnele Rice Gay, the testatrix, was born in the United States, and resided here for many years; that she married a British subject and went to reside in France, and that she resided there for about forty years prior to her death. She died at her winter residence in Nice on November 2, 1917. She had not visited the United States for more than twenty-three years before her death. If I am correctly advised by counsel her mother was the

daughter of John Tonnele, a wealthy Frenchman, domiciled or naturalized in this country. The now deceased lady left certain relatives named in her will, some of whom are foreigners and some Americans. They are her kindred *ex parte paterna* and *ex parte materna*.

On the 22d day of August, 1916, Mrs. Gay, the testatrix, made a " mystic " or secret will at her residence in Nice, France, in accordance with French law. It was delivered by her to a notary in the presence of six witnesses. The notary indorsed on the envelope a description of the instrument and a statement of the circumstances under which it was delivered to him, and the six witnesses signed their names on the outside of the envelope. It was then sealed by the notary and retained by him until her death. Subsequently and on the 5th day of November, 1917, the notary with whom the will was deposited, and the witnesses whose names were signed on the envelope containing the will, appeared before the president of the Civil Tribunal of Nice, a court having jurisdiction to prove or establish wills. The notary handed the document to the court and the witnesses then identified and acknowledged their signatures. The will was read before the court and subsequently recorded among the court records. On the 16th of November, 1917, the president of the Civil Tribunal at Nice authorized Benjamin Eastman Harwood, the universal legatee named in the will, to enter into possession of the property left by the deceased. On or about the 3d day of May, 1918, Anna Von Wernstedt commenced a proceeding in the Civil Tribunal of Nice to have the will of the deceased declared invalid upon the ground that she did not have testamentary capacity at the time she executed it. This proceeding is still pending. It was not prescribed by the French Code, but is referable to the civil law,

the common law of Latin countries. An order was subsequently made by the court restraining Benjamin Eastman Harwood, the universal legatee, from taking possession of the property of the deceased pending the determination of the proceeding. It will be observed that the French procedure on the probate or approbation of wills is much more formal than any the common law ever required. At common law nothing could be more informal than the probate (*probatio* or *approbatio*) of wills. Blackstone's institutional treatise gives a sufficiently accurate description of it (II, 508; III, 90). In the *Connell* case, hereafter cited, the Court of Appeals imported a more modern conception of probate, based on the modern New York procedure.

The question now presented to the surrogate for determination is whether, upon these facts, the court has jurisdiction and is obligated to issue ancillary letters to the petitioner.

It may be well to indicate at the outset that this matter involves a very important principle of the international law of domicile which ought not, I think, to be circumscribed too narrowly by purely local considerations if we would be in line with other civilized nations.

But be all this as it may, and it has been mentioned only for the purpose of giving this cause an atmosphere of reality, and taking it out of the region of assumption, it is established law, here as elsewhere, that the validity of a last will is governed entirely and solely by the *lex loci domicilii* of the testator, and that if sufficient at his domicile at the time of his death such will is valid in every other country in which the testator's movable property is situated. Story Conf. Laws, § 464; Savigny Conf. of Laws, § 34, ¶ 377; Bentwich Domicile & Succession, 99 et seq.; Dicey Conf. of

Misc.] Surrogate's Court, New York County, October, 1918.

Laws, 667, rule 184; *Isham* v. *Gibbons,* 1 Bradf. 72, 73. It was in view of this universal principle that executors of foreign wills, duly authorized in the foreign domicile, were at first recognized as *prima facie* entitled to assets of the estate in all other countries without any ancillary administration. *Doolittle* v. *Lewis,* 7 Johns. Ch. 49; *Brown* v. *Brown,* 1 Barb. Ch. 189. In some American states the foreign executors are even yet permitted to sue to recover local assets of foreign testators without other proof of right than the placing on record of their authority conferred in the foreign jurisdiction.

The practice in England in relation to ancillary letters is instructive. Acting on the recognized principle that the validity of a foreign will is determined by the *lex domicilii* of the testator, the Court of Probate, in England, in the exercise of its ordinary jurisdiction, always, as a matter of course, grants ancillary letters to the executors of such foreign wills. Theobald Wills, 79, citing *In bonis Earl,* 1 P. & D. 450; *In bonis Briesemann,* 1894, p. 260; *In bonis Von Linden,* 1896, p. 148. In England no modern statute seems to have been regarded as necessary to enable an English court vested with ordinary probate jurisdiction to grant ancillary letters; nor was the production in England of the original foreign will indispensable. Theobald Wills, 79, citing *In bonis Lemine,* 1892, p. 89; *In bonis Von Linden, supra.* I am of the opinion that no special or express statutory authority was formerly regarded as necessary to confer on an American court, vested with the ordinary probate jurisdiction, the power to grant ancillary administration on a foreign will. Such a power was regarded as an incident of the probate jurisdiction itself. Williams on Executors, in his own note to the early English edition of 1838, referring to ancillary administration in America, seems to confirm

Surrogate's Court, New York County, October, 1918.    [Vol. 104.

this view about the theory originally held in American courts of probate generally. I, 226. That excellent, and I may add very learned, authority on our domestic probate law, Mr. Redfield, was also of the opinion that the power to issue ancillary letters on foreign wills was in New York an incident of the probate jurisdiction, and that the statute of this state regulating ancillary letters was only confirmatory of the probate jurisdiction.

But whatever elsewhere may be the practice on foreign wills in New York, from the very earliest times, ancillary letters of administration and ancillary letters on foreign wills were issued by the surrogate as an incident of his ordinary probate jurisdiction, and without any other special authorization by statute. Redf. Surr. (5th ed.) 264; *Isham* v. *Gibbons,* 1 Bradf. 78; *McArthur* v. *Scott,* 113 U. S. 340, 399. In comparatively recent times the earlier New York precedents, if precedents they are, seem to have been either ignored or else deliberately displaced by a contrary juridical assumption of the judges of this state. Thus the Revised Statutes, or Mr. Throop's later revision of the statutes bearing on the surrogates, without any direct provision to that end, came to be regarded here as the sole foundation of the surrogates' jurisdiction to issue ancillary letters on foreign wills. *Taylor* v. *Syme,* 162 N. Y. 517; *Baldwin* v. *Rice,* 183 id. 55; *Matter of Connell,* 221 id. 190. As matter of course I am bound by these final decisions, nor could I properly question them if I were so disposed. In the orderly application of our hierarchical juridical system no judge of an inferior court is at liberty to question the decision of a higher tribunal. But I am bound to notice that such decisions give rise to contentions in this matter of consequence, and in others of far-reaching importance, and these contentions, when presented, I must examine.

Misc.] Surrogate's Court, New York County, October, 1918.

It is claimed and assumed in this matter before me that there is now a fundamental difference in this jurisdiction between an application for ancillary letters and an application to prove in this jurisdiction *de novo* a foreign will affecting movable property and persons in this jurisdiction. It is here claimed that in the instance of an application for ancillary letters (which are really any letters in aid of foreign administration) the validity of such foreign will is not open to attack. But if the form of the application is for an original probate or a probate *de novo* of a foreign will, then the validity of the will is open to attack for any cause impeaching a domestic will in this jurisdiction. It may be that this contention is sound in law, but I take leave to doubt it. It seems to me that if a surrogate should on any application, either original or ancillary, undertake to question the validity of a foreign will, recognized as valid in the foreign state in which was the testator's last domicile, some higher law or equity would intervene in some form and deprive that surrogate of such an improper jurisdiction. If the surrogate alone cannot apply the doctrine of " *Renvoi,*" as other courts can, then some other court of the state may. It would be the height of absurdity, in my judgment, if a will made by one of French descent, who was long and permanently domiciled in France and recognized to be valid by the laws of France, could be adjudged by a surrogate of New York to be invalid in France or in this country for want of testamentary capacity by the laws of either France or this country. Of course the foreign will might be insufficient for reasons apparent on its face to operate as a transfer of property in this country, but that is another and different question, to be answered in another and different way than in either an ancillary or original probate proceeding.

Let us examine the present distinction between the practice regulating ancillary letters and original letters issued here on a foreign will. It is, I think, comparatively modern. Formerly the test of an ancillary administration did not depend on the form of the letters issued by the probate judge or surrogate, but on the facts of a given case. If a foreign will was in any proceeding, no matter what, proved to be *de facto* or valid, according to the law of a testator's own domicile, and a supplementary administration was required here, such administration here was regarded as ancillary. See generally Woerner's Amer. Law of Administration (2d ed.), 360, and cases cited; *Ordronaux* v. *Helie,* 3 Sandf. Ch. 512, 518.

Precisely when the practice arose in the Anglo-American courts of probate of granting ancillary letters on foreign wills, as contradistinguished from ordinary letters, is somewhat uncertain. From a brief examination, I am inclined to think that it arose comparatively recently, and as a matter of public convenience. In the last two preceding centuries the increased mobility of human society has naturally occasioned new questions involving domicile and the conclusive extraterritorial effect of foreign administrations. These questions gave rise to new forms of procedure. But new forms of procedure do not affect substantive law. The reverse is always the case.

At first, in the probate courts of England, there seems to have been some doubt as to the binding effect there of any foreign administration. *Matter of Goods of Read,* 1828, 1 Hagg. Ecc. 174. But there was soon a tendency to recognize it as controlling where the deceased foreigner left property in England. *Viesca* v. *D'Aramburu,* 2 Curt. 277. Mr. Burgin in his " Treatise on the Administration of Foreign Estates," gives an excellent précis of the rise of this doctrine in

England (chap. 21).   In some instances international treaties next came to regulate the administration of the estates of foreigners. Dicey Confl. Laws, 446, note 1.   I have had such instances constantly before me in this court, and the treaty is then controlling.   So it was that in course of time it became so much a matter of course to grant local ancillary letters to foreign executors, that a special adjective procedure appears to have been devised to facilitate the process of obtaining ancillary letters.   This procedure, originating in the domestic probate courts, in the course of codification came to be restated in the codifying statutes of this state.   Then juridical hypothesis stepped in and attributed to the statute, if I am not misinformed, the surrogate's entire authority for the issuance of ancillary letters.   In my humble opinion the growth of the law regulating ancillary administration in our probate courts was the exact converse of the late juridical hypothesis, which may be, however, justified by the theory that when a statute directs the mode of issuing letters it is to be regarded as exclusive, provided the intention of the acts conferring on Surrogates' Courts an historic and definite jurisdiction is ignored or disregarded altogether, as is the tendency in this state since the adoption of the Constitution of 1821.

If we go further in our analysis of principles we shall probably find that the basis of our domestic law of ancillary administration in aid of administrations on foreign wills really depended originally on the growth of international comity and the rules of what is called private international law.   See *Despard* v. *Churchill*, 53 N. Y. 199.   The principles enunciated in that system were founded on the recognition of the fact that there can be but one estate of a foreigner who dies owning property both at home or abroad, or in states where he is not domiciled.   Private

international law recognized that the true situs of the property rights of such foreigner is at his own last domicile. But it was forced to recognize also that as every sovereign state claims dominion by *vis major* to regulate the transfer of all property within its own territorial jurisdiction the property rights of such foreigner, to his property situated outside of the state of his domicile, could be transferable only subject to such rules as the state, in which the property is situated, chose to impose. The necessities of this last fact probably gave rise to the modern practice now regulating ancillary administration of the estates of foreigners, and to the code distinctions between applications for principal or chief administrations and applications for ancillary administrations.

It now becomes necessary to notice the prior practice of probate courts when the foreign will was made in a country where the civil law prevails. In the instance of the wills of inhabitants of those countries where the Anglo-American probate system does not prevail, and there is no executor of a will, the custom of both English and domestic courts of probate has been to recognize the right of the " heir," or " universal legatee," to ancillary administration. *Lauenville* v. *Anderson,* 2 Sw. & Ir. 24; *Ross* v. *Willett,* 76 Hun, 211; *Matter of Goods of Smith,* 1868, 16 W. R. 1130; *Matter of Goods of Earl,* 1867, L. R., 1 P. & D. 450; *St. Jurjo* v. *Dunscomb,* 2 Bradf. 106. And see Burgin, Law of Administration of Foreign Estates generally. In the system of the civil law the " heir " or " universal legatee " takes the place of the executor of the common-law system. Those familiar with our early law will remember that at first it was thought that there could be no will without an executor, who was held to be the *" heres "* of the Roman law. It was on the strength of the adjudications last mentioned

above, which I unfortunately omitted to cite in my opinion, that I decided *Matter of Connell,* 92 Misc. Rep. 325; affd., 175 App. Div. 986, and revd., 221 N. Y. 190. In the course of the appeal from my judgment in the *Connell* case none of such decisions seems to have been noticed, and although long recognized in practice they were, I think, overturned, in effect, by the Court of Appeals, with the possible result that there can now be no ancillary administration in this state on wills made in Latin countries where the civil law prevails, unless it be that the new and very important statutory amendment, to which I shall hereafter refer, obviates this sweeping effect of the final decision in the *Connell* case, and thus causes our present law to conform with the modern rules of private international law, now regulating ancillary administration in other common-law countries when the will is that of a foreigner domiciled in a Latin country.

The Court of Appeals has lately decided, as I understand it, that a next of kin may intervene in a proceeding for ancillary letters of administration for the purpose of raising the question of jurisdiction of the court to issue such letters. *Matter of Connell,* 221 N. Y. 190. This overrules a contrary practice in this court founded on the statute which required notice to creditors only. Therefore Anna Von Wernstedt has a right to intervene in this proceeding and her intervention cannot now be dismissed.

As I have already indicated, it seems that the old jurisdiction of the surrogate to issue ancillary letters is, by the *Connell* case, made dependent wholly upon the existence of the preliminary requirements prescribed by section 2629 of the Code, and that there can be no ancillary administration on a will not admitted to " probate." In *Matter of Connell, supra,* the Court of Appeals held that a will executed before a notary

and certain witnesses in the province of Quebec, Canada, and registered in a certain office there, was not " admitted to probate " within the meaning of those words in (former) section 2695 of the Code so as to justify this court in granting ancillary letters. Now we come to the real question arising on this application. The *Connell* decision was made upon the particular language of the section of the Code in relation to ancillary letters which was in force prior to September 1, 1914. At that time section 2695 read: " Where a will of personal property made by a person who resided without the state at the time of the execution thereof, or at the time of his death, has been admitted to probate within the foreign country or within the state or the territory of the United States where it was executed."

In the extensive modification of the sections of the Code relating to surrogates' courts effected by chapter 443 of the Laws of 1914, section 2695 was numbered 2629 and amended so as to read as follows: " Where a will of personal property made by a person who resided without the state at the time of the execution thereof, or at the time of his death, has been admitted to probate *or established* within the foreign country, or admitted to probate within the state or the territory of the United States, where it was executed." It is to be noted that the amendment consists in the words " or established " before the words " within the foreign country." As it is the amended section which must govern me in this application, it seems to me that the question to be considered is whether the procedure adopted by the notary with whom the will was deposited in appearing before the president of the Civil Tribunal of Nice and having the will opened and read and recorded in that court constituted such a determination of the testamentary character of the

script as would be comprehended within the words " established within the foreign country " as used in section 2629 of the Code. A careful consideration of the amendment leads me to believe that it ought to be held that it was the intention of the legislature in adding the words " or established " after the words " admitted to probate " to distinguish between the procedure necessary to the probate of a will as required by the laws of this state or the laws of any state or territory in the United States and the procedure required to give effect to a testamentary instrument by the laws of a foreign country, particularly one where the civil law prevails. If this inference is correct the amendment requires the issuance of ancillary letters in this state where a testamentary disposition of property made by a resident of a foreign state has been made effective because of a compliance with the formalities prescribed by the laws of the foreign state. If the legislature did not intend to distinguish between our requirements for probate and those required by the law of many foreign states, the addition of the words " or established " would have been unnecessary, particularly in view of the fact that the word " probate " is used strictly only in connection with wills executed in English speaking possessions or in any of the states or territories of the United States, while the word " established " is used exclusively in connection with other foreign countries.

The very learned counsel for the objector contends, with his usual learning and acumen, that the word " established " was intended by the legislature to apply to an action or proceeding in the Supreme Court, or a similar proceeding in a court of a foreign country, and that until such a proceeding had been terminated, and the will established, this court would have no jurisdiction to issue ancillary letters. If this contention

Surrogate's Court, New York County, October, 1918. [Vol. 104.

were valid, no testamentary disposition of property, recognized as effective under the laws of France for the purpose of disposing of all of the personal property of a testator, could ever be the basis of ancillary letters in this state, unless an action had been brought to determine the validity of such testamentary disposition in a competent tribunal in France. If none of the heirs or next of kin contested the validity of such testamentary disposition, there would be no occasion for such a proceeding in a French tribunal. If, for instance, in the matter under consideration, Anna Von Wernstedt had not begun a proceeding to declare the will invalid, nothing would have been done in addition to the proceedings which had already been taken before the president of the Civil Tribunal, and therefore, according to contention of counsel, no ancillary letters could ever have been granted in this state. I am consequently not profoundly impressed with the reasoning of the contention that the legislature had intended by the word " established " a proceeding in a foreign state substantially similar to an action in our Supreme Court to establish a will. It seems to me, from an examination of the French Code and the record of the proceeding before the Civil Tribunal of Nice, that the will of the testatrix was " established " before that tribunal within the sensible and real meaning of the requirements of section 2629 of the Code of Civil Procedure, and that the universal legatee, to whom " *envoi en possession* " was granted by that court is justly entitled to receive ancillary letters in this court. In view of the fact, however, that a proceeding is pending in the Civil Tribunal of Nice to determine the validity of the will, I will direct that ancillary letters issue to the applicant only upon his giving a bond in the value of the personal property of the deceased located in this state. I doubt if I can go further if all my powers

as a judge are narrowly confined by the letter of statutes, as maintained in this state, and denied by the United States Supreme Court. *McArthur* v. *Scott,* 113 U. S. 399.

It is also contended on behalf of Anna Von Wernstedt that the papers submitted on the application for ancillary letters did not comply with the requirements of section 45 of the Decedent Estate Law. While there are, perhaps, minor defects in the authentication of the papers, they have been expressly waived by counsel, and irrespective of waiver I find that there has been a substantial compliance with the requirements of that section.

Decreed accordingly.