## CHAINE a. WILSON.

*New York Superior Court; Special Term, October,* 1858.

*Again, General Term, December,* 1858.

### ATTACHMENT.—NON-RESIDENT.

In the year 1846, the defendant (who had formerly been a merchant in New York, and had retired from business, and had gone with his family to reside on a farm owned by his wife in Norwalk, Conn.) resumed business in New York, but continued to reside with his family in Norwalk. In 1856 he made up his mind to become a permanent resident in New York, as soon as he could make a satisfactory purchase of a house. At that time he conveyed his farm at Norwalk to his son, who thenceforth took charge of it. But the defendant continued there with his family, coming to New York to attend to his business, and himself boarding at a hotel in New York during the busy season, but going home to Norwalk every Saturday night, and occasionally during the week; and during the slack season of business, spending the most of his time at Norwalk. During the commercial disasters of 1857, under the apprehension that his property might be liable to attachment as that of a non-resident, he took rooms at a hotel in New York for himself, wife, and youngest child, and had them with him in those rooms until January, 1858, when his wife and child returned to Norwalk on account of the child's illness. In a few days after that, the defendant gave up his rooms at the hotel and followed them to Norwalk, where he spent the whole of his time until the latter part of May, 1858, being confined to his house by illness; after which he was only occasionally in New York, a transient guest at a hotel, his family remaining at Norwalk, where he spent the most of his time. His sole business was in New York, and there he kept his bank account. The last time he had voted in Norwalk was in November, 1856, and he voted in New York in November, 1857, and he deemed himself a resident of New York after his removal to the hotel there.

*Held,* that he was not a resident of New York, and that attachments issued in April, May, June, and July, against his property on the ground that he was a non-resident were to be sustained.

Whether a man's absence from his family be for so many hours in each day, or so many days in each week, if his family live in a neighboring State, and he provides for them, resorts to them on the Sabbath and other days of cessation from business, and abides with them whenever the immediate demands of his business will admit, and whenever sickness disables him from business, he is to be deemed a resident of that State, and a non-resident of this State, within the provisions of the attachment laws.

To effect a change of residence, it is not enough that one intends to change it, and believes that he has done what amounts in law to a change. The intent and fact must concur, and his opinion cannot produce the result.

Upon an appeal from an order founded upon the decision of a question of fact

upon conflicting affidavits and doubtful circumstances, the order should not be reversed unless the appellate court is satisfied that the decision of the judge who made it, upon such question of fact is wrong.

Appeal from an order denying a motion to discharge an attachment issued against the property of the defendant as a non-resident.

This was one of five actions brought at about the same time in the Superior Court against the same defendants, by several plaintiffs. Between the 13th of April and the 1st of July, 1858, attachments were issued in the several actions against the property of the defendant Wilson, on the ground that he was not a resident of this State.

The defendants moved at special term to discharge the attachments on the ground that he was a resident.

The motion to discharge the attachments was based on an affidavit made by Mr. Wilson, on the 30th of July, 1858, and on five other affidavits. The allegations of the affidavit of Wilson were as follows :

" That an attachment has been issued in this action against the defendant, Lewis O. Wilson, and levied upon property which belonged to him, on the alleged ground that at the time of the issuing of such attachment on the 25th day of May, 1858, he was not a resident of the State of New York, but resided in the State of Connecticut :

" That deponent was for some years a resident of Norwalk, in the last-mentioned State, having gone to reside there on a farm belonging to his wife, when he retired from business in the city of New York; and in the year 1856, he resolved to become a permanent resident of the city of New York :

" That in that year he conveyed to his fourth son Oliver, on his attaining his majority, all the real estate deponent owned at Norwalk, together with all the personal property and movables connected therewith : and the said Oliver took possession of said property, and the farm aforesaid, and what had been the homestead, and assumed the entire and exclusive control of each and every of them, as his own, and has continued to hold and own them, and each and every of them, from that time to this :

"That at the time of such transfer, deponent, with his wife and youngest boy, now aged about seven years, resided together in said homestead, and composed then, as they have since, his entire family or household, his children, other than said youngest, not dwelling with him :

"That soon after deponent had ceased to be a resident of Norwalk, and up to the present time, his wife and child have been for long periods at Norwalk, in the house of his son Oliver ; but deponent had a room and was a permanent boarder at the Astor House for a long time prior to the fall of 1857, and spent most of his time in this city, going to Norwalk usually on Saturday, and remaining over until the following Monday, and sometimes going on Wednesday and returning the next day, though his visits of the latter kind were not common :

" That in order to select a date, in reference to which the question of evidence may be presented in this suit, and not to admit that his residence was different at any prior date, deponent states that there was no time in the years 1857 or 1858, when, according to his knowledge, information, belief, opinion, or intent, he was a resident of the State of Connecticut, but during the whole and any part of said 1857, and so much of 1858 as has elapsed, he has been, and now is, as he believes, a resident of the city and State of New York :

" That in the fall of 1857, when the defendants became affected by the commercial embarrassments then so general throughout the United States, it was suggested to deponent that some question might be raised as to his place of residence, and he met the suggestion by the confident declaration, that no such difficulty could arise, as he was a resident of this State : to this position deponent then adhered, as he now adheres, in good faith :

" That one of the persons who spoke to him on this subject was Nathan Hendrix, a clerk in the house of defendants, who advised that, notwithstanding deponent's confidence on the point, it was better that all doubts concerning it should, if possible, be removed by deponent's taking his wife and son away from Norwalk, keeping them domiciled here, and establishing the ostensible, as well as the actual character of his residence, by unequivocal indications.

" Influenced by such advice, deponent, in the fall of 1857,

Chaine *a.* Wilson.

engaged for himself and said family a parlor and bedroom, at the St. Nicholas Hotel, in said city of New York, and they with him took possession of and occupied said apartments as their only home, from the 12th day of October, 1857, until about the 22d day of January, A. D., 1858, when deponent's said youngest boy being ill, and Doctors Pratt and James O. Smith, of said city, being called to attend him, they advised that said boy should, for the benefit of his health, be taken to the country, for which reason (and for which alone) deponent's wife went with said child to the residence of Oliver, aforesaid, in Norwalk :

"That deponent, a few days afterwards, went to see them, intending the visit to be temporary : that while in Norwalk he became indisposed ; afterwards, seriously ill, and continued to be incapable of resuming business, until towards the latter part of May, A. D., 1858, for which reason he was detained, and he continued at Norwalk, without, however, entertaining at any time the intention or idea of ceasing to be a resident of New York, but intending all the time that his residence should, as he believed did, continue in that city :

"That in the month of March, A. D., 1858, deponent's wife returned from Norwalk to New York, with the aforesaid son, and resumed the apartments in the St. Nicholas Hotel, which they had before occupied, deponent expecting and promising that he would follow them to said city in a few days, but his illness prevented his doing so :

"That from the time they left said hotel in January, until the aforesaid return thereto in March, some of their personal property had been left there, from the intent and design that they should resume possession of it on their contemplated return from Norwalk :

"That about the first of April, deponent's said wife went with said boy to Norwalk aforesaid, and has remained there since with her said son Oliver ; but since deponent was able to remain in the city, and give any attention to his affairs, viz., since the latter part of May, he has been residing at the aforesaid St. Nicholas Hotel, visiting his wife and child at Norwalk occasionally, and having recently passed some time at Saratoga Springs for the benefit of his health :

"That at the last mayoralty election held in this city in No-

vember last, this deponent gave and deposited his vote as an elector of the city and county of New York, at the polls in said city, believing then, as he now believes, that he had a full legal right to do so:

"That the various visits made either by deponent's wife or his child, or himself, to Norwalk, as hereinbefore described, were all in fact, and all intended to be temporary sojournings for the pleasure of social intercourse with their son, or other members of their general family, or change of scenery or air, or the safety or improvement of health, but all of them with the intent and determination, in good faith, that deponent's residence in New York, and the right or duties connected with it should remain unaffected and unaltered by such sojournings:

"That the chief reason why deponent did not have any tenement other than a hotel, was, that it has long been his resolution not to occupy a house in New York, with his family, until he owned one, but to have a home in a hotel; and he has conferred with several of his friends, and made efforts to obtain an eligible property in the city, wherein to have himself and his family permanently established:

"And this deponent lastly saith, that since the year 1846, when he resumed mercantile business in the city of New York, his business has been at all times in said city."

The affidavit of Nathan Hendrix stated, that he had read the affidavit made by Wilson, and "that deponent, in the fall of 1857, had a conversation with said Wilson, and gave him advice, the substance and purport of which is correctly stated in said affidavit:

"That deponent heard at the time of Mrs. Wilson leaving the St. Nicholas Hotel, with her son, for the improvement of such son's health, as stated in said Wilson's affidavit:

"That a few days after her departure, said Wilson informed deponent of his intention to visit his family at Norwalk; saying, in substance, that he thought he should have some recreation, and that he expected to be absent about ten days, but not to exceed, at the utmost, two or three weeks: that as the defendants had then suspended regular payments in their business, the presence of the said Wilson was not deemed so important as it had been on former occasions; and the embarrassment of the house had given him so much uneasi-

ness, that deponent also thought said Wilson required respite from labor:

"That in the month of April, A.D., 1858, deponent saw said Wilson at Norwalk; and deponent states that said Wilson was then quite unwell, and incapable, in deponent's opinion, of attending to his ordinary affairs and business by reason of indisposition."

Robert B. Coleman made an affidavit, stating, "that previously to the 12th day of October last" (1857), "said Wilson engaged rooms at the St. Nicholas Hotel aforesaid for himself and his family, and that he removed with them to said rooms on said last-mentioned day—such family consisting of Mr. Wilson's wife and child; and said Wilson occupied said room with them regularly and uninterruptedly from said day until the 12th day of January last, when in consequence of the child's illness, as deponent was informed and believes, Mrs. Wilson and such child went to Connecticut.

"Mrs. Wilson and the child returned to said hotel on the 22d day of March then next; and on the 30th day of March following, she left the hotel with the child to go again to Connecticut, as deponent was also informed and believes."

The affidavit of James O. Smith stated, "that he is a practising physician in said city, and has been such for thirty-three years: that on the 17th, 18th, 19th, and 20th days of January last, he was called to attend in his professional capacity a child about ten or eleven years of age, who was, as deponent was informed and believes, a son of L. O. Wilson above named: deponent found the boy with his mother in apartments at the St. Nicholas Hotel, in the city of New York: the said child was taken by his mother to Connecticut for the change of air, and other benefits which deponent thought would result from the removal; such advice was given professionally, and as the spontaneous result of deponent's observation and judgment."

The affidavit of Ira Gregory stated, "that he resides in the town of Norwalk, in the State of Connecticut, and is a physician duly licensed to practise medicine and surgery, and knows Lewis O. Wilson, one of the defendants named in each of the above entitled actions: and deponent further says, that he visited the said Lewis O. Wilson at Norwalk, aforesaid, in a pro-

fessional capacity, several times during the months of February and March last:

"That at these several times or visits in February and March, 1858, deponent found said Lewis O. Wilson suffering with very severe rheumatism, accompanied with tumors about the head and neck, and a stiffness and pain in his neck, and incapacitated to attend to any business away from his room; that said Lewis O. Wilson was then and there advised by deponent not to return to New York until he recovered himself from the severe attack of rheumatism he then labored under:

"That deponent believed and looked on the said Lewis O. Wilson as being a citizen and resident of New York for the last three years, or since he sold and conveyed his homestead property in Norwalk to his son, Oliver Wilson:

"That said Lewis O. Wilson was not in the habit of attending town-meetings or elections in this State since he conveyed his said property as above mentioned."

Of the opposing affidavits, several were made by residents of Norwalk, Connecticut, and were to the effect, that Mr. Wilson has resided in Norwalk for many years past, and that the affiants had frequently seen him at his residence there during the winter, and spring, and summer of 1858: that they had also, up to the date of their affidavits (August and September, 1858), every few days seen his wife and family there, during the winter, spring, and summer then just past: that they had always heard him spoken of at Norwalk, as a resident of that place. The other opposing affidavits are to the effect, that he voted at Norwalk at the Presidential election in 1856. He was assessed as a resident of Norwalk in 1858, the usual poll-tax, and was regarded and treated by the Board of Assessors as a resident of that town. His wife regularly attended church at Norwalk.

Up to October, 1857, during the active business season, he was at the Astor House several months at a time; at other periods, two or three days, or a week at a time; and the intervals he passed at Norwalk. He at no time had more than an ordinary bedroom at the Astor House, and paid the usual price of a guest of said hotel. He had no permanent lodging-room, except during the business season; at other times he had no regular room, but occupied such as was assigned him. He

Chaine *a.* Wilson.

had very little baggage there, and usually only a carpet-bag: that he went to the St. Nicholas Hotel with his family in October, 1857, and they left in January, 1858, and then gave up the apartments he had occupied with his family. While there he paid his bills weekly. In March, 1858, his wife and part of his family returned and stayed a few days, and then left, giving up the apartments they had occupied. When Mr. Wilson has been there since, he has been assigned some vacant room, and he has been charged as other temporary guests: that applications were made at the St. Nicholas Hotel in September, 1858, for Mr. Wilson, in order to serve papers on him. He could not be found there, and the answer made to inquiries for him was, that he was not staying there, and had no room there.

No notice of any application to vacate or set aside the attachments was given until the 31st of July, 1858, after judgment had been perfected in each action, and an execution on such judgment had been issued and levied on the property of Mr. Wilson.

*James T. Brady*, for the motion.

*J. W. Edmonds*, and *D. D. Field*, in opposition.

HOFFMAN, J.—1. The domicile and residence of the defendant in Norwalk, Connecticut, down to August, 1856, must be conceded, I think, upon the defendant's own papers, and I feel justified in concluding, that it subsisted until the fall of 1857, when the deed to his son was recorded. He voted in Norwalk at the Presidential election in November, 1856. He is retained upon the tax-list of that town, and on the list of persons subject to a poll-tax, for even the year 1858.

2. During much of the year 1857, and down to October of that year, he occupied a room at the Astor House, without any part of his family, and frequently visited Norwalk. There his family dwelt during that period.

3. In October, 1857, he took rooms at the St. Nicholas Hotel, and occupied the same with his wife and one child. There he remained until January, 1858, when he vacated the rooms and went to Norwalk. In March his wife and child returned, and

spent a few days at the St. Nicholas. His sickness, which began in January, ceased in April, so far that the physicians were discharged; upon his own affidavit, it ended the latter part of May. We have no evidence of a residence for a day in New York, during April, or until the latter part of May, when he took a room, with occasional visits to Norwalk, and a visit to Saratoga for his health.

4. When he left the St. Nicholas Hotel in January, his rooms were absolutely given up. When his wife returned for a few days in March, she occupied a room like other transient guests, and the same was the case when he returned at the end of May. His statement as to leaving some articles at the hotel is much too vague to form a ground of decision. They must have been trifling; the clerks have not been called upon to corroborate the statement.

5. The advice which Hendrix gave the defendant, in the fall of 1857, to remove his family to New York, was given and acted upon expressly from the apprehension that his then residence was in Norwalk, or might be so considered. The removal was to effect the object of avoiding the attachment laws, not with a full intention to fix himself permanently in New York. He voted in New York at the last election for mayor.

The attachments in these suits were sued out respectively on the 13th day of April, the 22d day of May, the 4th day of June, the 18th day of June, and the 1st day of July, 1858.

These facts present two striking points:

*First.*—Of a clear case of domicile and residence at Norwalk down to the fall of 1857; and *next,* that, at the time of issuing two of the attachments, there was no actual residence in this city, and had not been for about four months, but an actual residence in Norwalk, without the least connection with a residence in New York by ownership of, or hiring a house, or even a room.

The character of the residence from October, 1857, to January, 1858, may perhaps present a very different case from that which will arise upon the facts subsequently, and might have exempted the defendant from the provisions of the attachment law. But, from January to the end of May, he had entirely detached himself from every semblance of residence in New York, and had resumed his former domicile and dwelling. A

more difficult question may be in relation to the other three attachments sued out, when he was in the actual occupation of a room in the hotel—had been so for over a month, and continued so for some time afterwards, with occasional absences.

It is to my mind clear, that his domicile, for the purposes of succession, testacy, or intestacy, liability to taxation, and enjoyment of the privilege of voting, continued through the whole period, and was, at the date of each of the attachments, in Norwalk.

The opinion of the master of rolls in Sommerville a. Sommerville (5 *Vesey R.*, 786), is as sure a guide upon this question as can be found.

The domicile established upon the facts in the present case is like the domicile of origin constituted there, " and it is to prevail until the party has not only acquired another, but has manifested and carried into execution an intention of abandoning his former domicile, and taking another as his sole domicile."

So Lord Cottenham says in Munro a. Munro (7 *Clark & Fin. R.*, 77): " To effect the abandonment of the domicile of origin and substitute another in its place, is required *le concours de la volonté et du fait—animo et facto;* that is, the choice of a place, actual residence in the place then chosen, and that it should be the principal and permanent residence."

The case of Sommerville a. Anderson (22 *Eng. L. & Eq. R.*, 614; and before the Privy Council, 29 *Ib.*, 59), applied the same rules to a domicile of choice, as are applicable to one of origin. The party had lost his origin of birth by residence in England with intention to abide there, and was held to have lost the latter domicile from a residence in France, keeping house for thirteen years there, with only occasional absences, and to have acquired one in France. He broke up entirely his English establishment upon removing to France.

In Evins a. Smith (14 *How.* (*U. S.*), 400; Curtis' ed., vol. 20, p. 252), Justice Wayne, delivering the opinion of the court, says : " It is difficult to lay down any rule under which every instance of residence could be brought which may make a domicile of choice. But there must be, to constitute it, actual residence within the place, with the intention that it is to be a principal and permanent residence."

And we find it laid down, that the domicile of a married man

is the place of his family's habitual dwelling, although he may be conducting business elsewhere. (*Phillimore on Domicile*, § 209, &c.; *Story's Conflict of the Laws*, p. 57; Catlin *a.* Gladding, 4 *Mason's R.;* see also the elaborate opinion of Surrogate Bradford in Isham *a.* Gebbins, 1 *Bradf. R.*)

It is not to be denied that domicile may exist independently of habitation, using that term as denoting merely actual abiding within a place. But contemplated habitation or rehabitation is also an element in the legal idea of domicile, when actual habitation does not exist.

The dwelling in one place, which is thus consistent with a continued domicile in another, is, under certain circumstances, called a commercial domicile, the residence, *negotiorum ratione*, of the civil law. (*Voet on the Pandects*, *B.* 5, *tit.* 1, § 98; *Drake on Attachments*, § 67.)

In Payne *a.* Taylor (10 *Louisiana R.*, 726), the suit was commenced by the attachment of the property of David Taylor as a resident of Massachusetts. He had for several years before been dwelling in New Orleans, and doing commercial business there under the name of D. Taylor & Co. In support of a motion to discharge an attachment, it was urged that his long commercial domicile made him a resident of New Orleans, where he could always be served with process. But the motion was denied. The phrase in the Code of Louisiana is nearly the same as in our own. See also Bryan *a.* Diarse (1 *Martin's Louisiana R.*, 412, new series).

Jackson *a.* Perry (13 *Bal. Mon.*, 211), is a valuable case to the point—that the ability to serve process upon a party, from finding him within the State is not the basis of an attachment law against the property of non-residents.

It must be admitted that several cases have countenanced the doctrine, that under the attachment law before the Code, the question depends upon the fact of a mere abiding in a place for some continuance of time, wholly irrespective of the true domicile. In the matter of Thompson (1 *Wend., R.*, 45; Haggart *a.* Morgan, 4 *Sandf. R.*, 198, and 1 *Seld. R.*, 422; Bartlett *a.* The City of New York, 5 *Sandf. R.*, 46). A very able, and, to my mind, satisfactory review of the case, is to be found in the opinion of Justice James, in Houghton *a.* Ault (16 *How. R.*, 78).

That examination is, I think, sufficient to show that those cases (even that of Haggart a. Morgan, in the Court of Appeals), as it did not control the case before the learned judge, could not govern the present one. Still, the last-mentioned case, although the decision was upon the ground of the execution of the bond having concluded the party, may, perhaps, be treated as deciding, that an absence of three years from an acknowledged domicile, and dwelling for that period in another place for business purposes, makes the party a non-resident of the first place, within the statute.

It would be difficult to contest the truth of the converse of this decision, and to avoid holding, that if a party was dwelling habitually in New York, for the same period, and solely for business purposes, he would be deemed a resident of New York, although his domicile was clearly elsewhere.

But the principle of these cases opens the question of the nature, object, and duration of absence or dwelling, which is to control each particular case. It would not be pretended that the dwelling for a week for a special purpose in New York made a party a resident, whose fixed habitation or domicile was elsewhere.

So we perceive that if the domicile does not supply a decisive rule, neither does the mere abiding within the place at the time of the service of the writ, furnish it; and thus each case must be left to the operation of all the rules usually applied to determine similar questions.

When this is conceded, then the case is open to the important consideration urged by Mr. Justice James, that the attachment under the Code differs from that under the Revised Statutes in this, that it is not a process for the commencement of an action, but is an arrest of the party's property in the nature of bail, for the payment of such judgment as he may obtain; that the statute was intended to give a remedy to creditors, whose debtors being absent could not be served with process, though domiciled within the State.

The case of Houghton a. Ault,* decided at special term by

---

* Houghton a. Ault.—(*Supreme Court, Fourth District, at Chambers, January,* 1858. *Affirmed on appeal at General Term, May,* 1858.)—This was a motion to vacate an attachment issued on the ground that the defendant was a non-resident.

Justice James, was. affirmed at general term of the fourth district. The facts were these : the defendant, a foreigner, had a family residing in Portsmouth, Canada, and there owned a ship-

---

The facts are stated in the opinion.

JAMES, J.—It is conceded that the facts set forth in plaintiff's affidavit are sufficient to warrant the issuing of the order of attachment; it showed the indebtedness of the defendant upon contract, the amount due, and stated that he was not a resident of the State, but resided in Kingston, Canada West.

The defendant now moves, before the officer who granted the order, to vacate the same, and offers to read counter-affidavits in support of his motion. The plaintiff objects to such affidavits being received.

Previous to the last amendment of the Code, there was considerable conflict of opinion and authority on this point. It was held in Conklin *a.* Dutcher (5 *How. Pr. R.*, 386), that such affidavits could not be received ; and that case was followed by White *a.* Featherstonhaugh (7 *Ib.*, 357) ; Bank of Lansingburgh *a.* McKie (7 *Ib.*, 560) ; Niles *a.* Vanderzee (14 *Ib.*, 547) ; while the converse was held in Killian *a.* Washington (2 *Code R.*, 78) ; Morgan *a.* Avery (7 *Barb.*, 656) ; New York & Erie Bank *a.* Codd (11 *How. Pr. R.*, 221) ; Farmer *a.* Walter (13 *Ib.*, 348), and other cases.

The last Legislature, in its amendment of section 241 of the Code, enacted that the defendant might, in all cases, move to discharge an attachment, as in other cases of provisional remedies. The provisional remedies given by the Code (*tit.* 7), are, Arrest and Bail ; Claim and Delivery of personal property ; Injunction and Attachment. In cases of arrest and bail, and injunction, the defendant may move to vacate the order on the original papers, or upon counter-affidavits of the moving party (*Code*, §§ 204, 205, 225) ; and the amendment to section 241, was no doubt intended, and did confer upon defendants, in attachment cases, the right to use affidavits to show the improvidence of the order on a motion for its discharge.

I shall therefore hold, that the affidavits offered in behalf of the defendant are properly receivable on this motion.

The next question is, was the defendant a resident or not, within the State of New York, at the time of issuing the attachment ?

Under the Code an attachment is not a process for the commencement of an action ; it is an order in the action, for the arrest of the debtor's property, in the nature of bail for the payment of such judgment as the plaintiff may obtain ; it may issue, in a proper case, at the time of commencing the action, or at any time afterwards. In these respects, it is entirely unlike the attachment provided by the Revised Statutes, that being the commencement of a proceeding, instituted and conducted out of court, before an officer who derived his power in the matter from the statutes.

The main facts in the case are these : The defendant, a foreigner, having a family residing in Portsmouth, Canada, and there owning a shipyard, comes to Ogdensburgh and leases a marine railway, on the 10th of July, 1856 ; in that lease he covenants not to carry on ship-building at any other place than the yard leased, after the expiration of six months ; he enters, immediately, into the possession of the yard, and continues to carry on business there, until the issuing of this attachment on the 1st day of December, 1857. During this period of seven-

yard. He leased a marine railway at Ogdensburgh, in July, 1856, began business there, and carried it on until the issuing of an attachment in December, 1857. During this period he

teen months, the defendant was most of the time at Ogdensburgh, his family remaining at Portsmouth, keeping house. The defendant, notwithstanding his covenant in his lease, continued work in his shipyard at Portsmouth, until some time in the month of September, 1857. In the mean time, he became largely indebted at Ogdensburgh. About the time of taking his lease, he mortgaged to his lessors the timber, spike, oakum, iron, blacksmith's, and shipwright's tools, shop-furniture, &c., as security for the payment of certain notes to the amount of $4340.88. In April, 1857, he assigned his interest in his lease, and all his property as security for indorsements made and to be made. His whole indebtedness at Ogdensburgh appears to be about $22,000, and his assets about $5000. He frequently represented himself as a non-resident, and stated that his property was liable to attachment ; that by the terms of his lease, he was only to pay so much on the tonnage of each vessel drawn out and repaired, as rent.

Upon these facts, the defendant insists that he is a resident of the State of New York, within the meaning of the attachment law, and that his property is not subject to arrest by order of the court.

To sustain this proposition, his counsel cited Haggart *a.* Morgan (4 *Sandf.*, 198 ; S. C., on appeal, 1 *Seld.*, 422). In the matter of Thompson (1 *Wend.*, 45) ; Towner *a.* Church (2 *Abbotts' Pr. R.*, 299) ; Bartlett *a.* The City of New York (5 *Sandf.*, 44).

The case of Haggart *a.* Morgan was an action on a bond given to release certain property seized by virtue of an attachment issued under the Revised Statutes. On the trial, the sureties offered to show that the defendant in the attachment was a resident at the time of issuing the same, by proving that his house was in the city of New York ; that he was housekeeping there at that time, and had been for many years ; that his absence at New Orleans was temporary, being necessarily detained there by a lawsuit ; that he had been so detained during his whole absence of three years. The court refused the offer,—1st. Because the offer showed the defendant to be a non-resident within the spirit of the act ; and 2d. That giving the bond to discharge the attachment prevented him from showing such fact. At general term, the court held, 1st. That the defendant was estopped from contesting that fact of non-residence in a suit on the bond. This disposed of the case—but the judge who delivered the opinion, went on further to say : "It was well observed by the judge on the trial, that the facts offered to be proved, showed defendant a *non-resident debtor* within the meaning of the statute. He had left the State without paying· this demand, and had remained abroad for three years. During all this time the plaintiffs had been *deprived of their just dues ;* and it would be strange indeed, if they could not, after such a prolonged absence, make their debtor's property to respond for this debt, because he had all this time the purpose of returning to the State when it might suit his convenience. It will be observed, that this part of the opinion was wholly *obiter*—and further, that it was not claimed or offered to be proven that defendant had a family, but only that he kept house within the State.

When this case came before the Court of Appeals, the judgment below was affirmed, and the ruling of the judge at circuit approved—both as to the estoppel and non-residence. On the latter point, the court said : "The ruling of the judge was probably correct for the reasons assigned by him. In the matter of Thompson

was most of the time at Ogdensburgh, his family keeping house in Portsmouth. He continued to do work also at the latter place, where he had property to a considerable amount.

(1 *Wend.,* 45), the distinction was taken between the *residence* of the debtor and his *domicile.* It was there held that his residence might be abroad, within the spirit of the statute, which was intended to give a remedy to creditors whose debtors *could not be served with process,* while the domicile continued in this State. In Frost *a.* Brisbin (19 *Wend.,* 14), it was said in a case like the present, that actual residence without regard to the domicile of the defendant, was within the contemplation of the statute. The defendant was, therefore, a non-resident *within these decisions,* although domiciled in New York.''

It will be seen that the Court of Appeals asserts no opinion of its own ; it merely declares the defendant a non-resident within the decision of the cases cited. The substance of the facts in one case is set out ; the other case, Frost *a.* Brisbin, was this : " The defendant, a citizen and resident of this State, took a large stock of goods to Wisconsin, leaving his wife and child at board in this State, stating that he intended to make Milwaukee his future residence. He remained at Milwaukee ten months in business, then returned to this State on a visit, and after staying two months, was arrested and held to bail. After his arrest, he returned to Milwaukee and continued his business. Before his visit, he was appointed a commissioner by the Legislature of Wisconsin, to distribute the stock of a bank, and a director of the same. On a motion to discharge the order of arrest, the court, after reviewing and citing the various cases, and particularly that of Thompson (1 *Wend.,* 45), says : 'The cases cited, establish that the transient visits of a person, for a time, at a place, do not make him a resident while there. *There must be a settled fixed abode, an intention to remain permanently,* at least for a time *for business,* or other purposes, to constitute a residence, within the legal meaning of that term. One of the cases expressly, and all of them virtually decide, that actual residence, without regard to the domicile of the defendant, was within the contemplation of the statute. The domicile of a defendant may be in one State or Territory, and his residence in another.' ''

It will, therefore, be observed that the first case which is made to uphold Haggart *a.* Morgan, was held to be within the spirit of the statute (both being commenced under the Revised Statutes), because such statute was intended to give a remedy to creditors whose debtors being absent, could not be served with process, though their domicile continued in this State ; and in the second case, the defendant had no domicile—his wife and child were mere boarders in this State, his place of business being clearly established in Milwaukee, and he claiming not that he had not a residence in Wisconsin, but that his two months' stay here on a visit to his wife exempted him from arrest, under the non-imprisonment act of 1831.

The reasoning to sustain the foregoing decisions has no application to this case. This action being commenced under the Code, the attachment is not an original process ; the Code has provided another means for commencing actions against absent and non-resident debtors ; and although the defendant in the first case may have been a non-resident within the meaning of the Revised Statutes, for the reason assigned, he was in fact a resident outside that statute. It is also to be observed that that decision was in furtherance of, and not to defeat the ends of justice. So of Frost *a.* Brisbin, it was in furtherance of justice, and was based

It was held that his legal residence was in Canada, and a motion to discharge an attachment which had been issued was denied.

upon facts entirely dissimilar to the case under consideration ; it was but giving construction to a statute ; in truth, it only decided what was the intention of the statute in exempting persons from arrest.

The case in the Court of Appeals being based entirely upon these two cases, so far as any thing is said about residence, without expressing any opinion of its own, and the decision of such point not being essential to the case, I cannot regard it a binding authority.

The case of Bartlett *a.* New York City (5 *Sandf.*, 44), was an application for an injunction to stay the collection of a tax assessed against the plaintiff as a resident of the city of New York. The facts showed, that prior to May, 1849, defendant resided and kept house in New York ; he then broke up housekeeping and removed his family to Westchester county ; he remained there until December, when he took rooms with his family in New York, where he remained until April, 1850 ; he then returned to Westchester county, and remained until December, 1850, when he again took rooms in New York ; during all this time his only place of business was in New York. The general act for the assessment of taxes, requires every person to be assessed in the town or ward where he resides when the assessment is made ; and by the laws of 1850, when a person shall reside during any year in two or more counties or towns. his residence for the purposes, and within the meaning of the section above, shall be deemed and held to be in the county and town in which his principal business shall have been transacted. It will thus be seen that the plaintiff's liability was clear. The court, however, saw fit to examine all the cases above cited, and adopted the definition there given to the term " residence ;" a conclusion not quite necessary to the decision of the case.

The next case is that of Towner *a.* Church (2 *Abbotts' Pr. R.*, 299). This case was decided at a general term of the first judicial district, in 1855. When the attachment was issued, whether under the Revised Statutes or the Code, does not appear. The facts were these : The defendant had resided with his family in New York city, and done business there for a number of years, when he and his family removed to Connecticut, and called that their residence ; but he kept rooms in the city, where he boarded and lodged all the week, attending to business (except that Sundays he spent in Connecticut). One judge held that the defendant was not a non-resident of the State, in the sense of our attachment laws ; and another judge held that whenever a person carried on a regular and systematized business in New York, in which he has invested his working capital, and in such business spends his time during the regular business hours of the day, having not only his stock in trade invested there, but keeping his bank account there, and if all his ordinary transactions take place there, such person fails to come within the fair intent and meaning of our attachment laws, although his family may be actually residing in New Jersey. That process in such case, either against the person or property, is as easily served, as against one whose family resides in the State.

This is a strong case, and more nearly in point than any other cited ; and if the facts in the case under consideration came within the rule above stated, I should feel bound by that decision, although I am unable to reconcile my judgment with

The case of Lee *a.* Stanley (9 *How. Pr. R.*, 272), is referred to by the learned judge, and approved. There, the defendant kept a house in Bradford, New Hampshire, where his wife and

its broad conclusions. That a man may have a residence in one State to vote, and in another to exempt him from attachment, seems preposterous. The idea that the word " resident," when used in the statute, means domicile, or home, or habitation in one place, and the reverse in another, is absurd. Besides, if in Towner *a.* Church, it was an attachment under the Code, the distinction between such an attachment and one under the Revised Statutes does not seem to have been noticed. There is much more propriety in requiring a debtor, whose domicile is without the State, to give security for the debt, than one whose domicile is within. Such a debtor, pending litigation, might sell his property, and remain at home, in which event he could not be reached by any of the provisional remedies or supplementary proceedings provided by our laws.

But the facts of the latter case were entirely different from the facts in this. In that, the defendant had a fixed business and permanent residence here before he removed to Connecticut. The business remained, and was not broken up, and he himself continued with his business six days in the week ; while in this case, the defendant never had a residence here—his house, domicile, family, and original business were in a foreign country, and continued there. His business here was not of that permanent nature required in Towner *a.* Church ; it was a lease, it is true, for ten years, but there was no covenant to carry on the business that length of time ; and he only had to pay, as rent, tonnage on vessels actually drawn out for repairs.

Under our former statutes, respecting attachments, where there was no other way of reaching the property of a debtor, whose domicile was in this State, but who remained abroad, a construction that he was a non-resident, might be justified by the necessity of the case, and in furtherance of justice ; but as the necessity no longer exists, that rule should no longer be followed.

But there are other decisions and definitions on this point than those above cited. Burrill, in his Law Dictionary, defines resident, as one who has a seat or settlement in a place,—one who dwells, abides, or lives in a place ; Bouvier, as a person coming into a place, with intention to establish his domicile or permanent residence, and who in consequence actually remains there ; Webster, a dwelling having an abode in a particular place for some time. In the matter of Fitzgerald (2 *Cai.*, 317), it was held, that a person who came into the State on a commercial adventure, without any intent of settling here, was not a resident within the meaning of the act for relief against absconding debtors. In the matter of Wrigley (4 *Wend.*, 602, and 8 *Ib.*, 134), Chief-justice Savage, in speaking of the case of Fitzgerald, said : " It was held that a resident within the State, was one who had a residence of a permanent and fixed character." Chief-justice Shaw (in 1 *Metcalf.*, 245) says : "The question of residence, inhabitance, or domicile, although not in all respects precisely the same, they are nearly so, and depend much on the same evidence." In Crawford *a.* Wilson (4 *Barb.*, 505), the general term of this district held, that " the terms legal residence, inhabitance, and domicile, mean the same thing ; that by legal residence, they meant the place of a man's fixed habitation, where his political rights are to be exercised, and where he is liable to taxation."

The case of Lee *a.* Stanley (9 *How. Pr. R.*, 272), was a much stronger case for

Chaine *a.* Wilson.

family resided, in which he entertained his friends, and was called by him his home.  He had a store of goods and was doing business in Franklin in this State.  He appeared to have divided his time about equally between these two and a third place: an attachment was sustained by Judge Clerke.  He

the defendant, as shown by his own affidavit, than the present, and yet, the motion to discharge the attachment was denied.  In that case, the defendant had actually resided, and carried on mercantile business in Franklin county, in this State, for about two years, with the honest intention of making such place his permanent residence ; but he had a family, and had kept house and entertained his friends in New Hampshire, during his whole stay in this State.  The court held that his legal residence was in the State of New Hampshire.

In my judgment, the Code, where in its provisional remedies it uses the term *residence* or *resident,* means *legal residence.*  Within the principle of the Case of Crawford *a.* Wilson, as applied to the facts in this case, the defendant was not a legal resident of the State at the time the attachment issued.

At that time he had a fixed habitation and abode in Canada, where his family resided and kept house, and where he and they had resided and kept house, long before he came to Ogdensburgh, and where he had and did entertain his friends.  He had never changed that habitation.  If he ever had the intention of changing his abode, and removing his family to Ogdensburgh, of which there is great doubt, judging from the whole case, it had been abandoned some months before the attachment issued.  He continued to own a marine railway in Canada, and to carry on business there as late as last September ; his letting of said railway, at that time, looked as though not made in good faith.  He had other property to a considerable amount in Canada, if credit can be given to his statements ; and thus his property, his home, and his family were in Canada.  Against this is the fact that he had done business at Ogdensburgh for the past seventeen months, giving it his individual presence and attention ; but the railway, where his business was conducted, was occupied under a lease for ten years ; he was not, by said lease, compelled to carry on the business, nor to pay rent unless he did, as he only paid on the tonnage of vessels actually drawn out.

He had mortgaged all his property here, at about the time of his lease, and last April assigned his interest in the lease itself, together with all his property here, as collateral security for an amount which here he had no means of paying.  His business might, therefore, be abandoned at any moment.  He had received large sums of money for work, and left unpaid his tradesman bills, mechanics' and laborers' wages, and suffered his notes to go to protest, thus showing that his money was secreted or had been expended on his property in Canada.  In his conversations, he spoke of himself as a non-resident, and his property as liable to attachment.

Under such a state of facts, I have no hesitation in saying, that the defendant's legal residence was in Canada.  Neither have I any doubt, that within the fair intent and meaning of the attachment law under the Code, the defendant was a non-resident of the State, whether such residence be termed legal or actual.

The motion for a discharge of the attachment must be denied, with $7 costs.

adopted the rule stated by Mr. Justice Paige, in Crawford *a.* Wilson (4 *Barb. R.*, 504), that the terms legal residence, inhabiting, and domicile, mean the same thing, with few exceptions, and that the domicile in New Hampshire remained unchanged.

Barry *a.* Bockover (6 *Abbotts' Pr. R.*, 374, April Term, 1858), was before this court at general term. The question arose upon the following facts, on a motion to discharge an attachment: The defendant was one of the firm doing business in New York since January, 1854. He spent the whole of every business day in New York, with the exception of occasional absences from sickness, or absence on business of the firm. All his working capital was invested in New York, where his individual bank account, as well as that of his firm, was kept. He had spent eight hours of every business day in the city. Process could always have been served upon him, and was actually served at his store.

His family, however, resided in Jersey City, in a house hired by him, and he slept there every night, with occasional absences, and remained there regularly from Saturday night to Monday morning. He owned no real estate in Jersey City.

It was held that he was a non-resident, and an attachment was sustained by the court.

These cases appear to me to have restored the criterion of domicile to a strong, if not controlling influence upon these questions under the Code. Indeed they decide little more than is contained in the early case of Fitzgerald (2 *Caines*, 318).

The law of domicile has sprung from the Civil Code, and we may with advantage resort to the exposition of that law upon the subject. The statement of its rule generally found in treatise and decisions is, *Ubi quis larem ac fortunarum suarum summam constituit.* The residue of the passage is, *Unde rursus non sit discessurus si nihil avocet: unde cum profectus est, preregrinari videtur, quo si rediit, peregrinari jam destitit.* (*Domat.*, vol. 2, p. 484.)

What is the meaning of the word *Larem* in this definition?

Lord Rosslyn in the Douglass case (see 5 *Vesey R.*, 758), adverts to an expression in one of the letters in evidence, that the writer did not mean to set up his *tabernacle* in Scotland, and speaks of this phrase as a fair interpretation of the word *Larem*. If we look to its signification in writers of acknowledged au-

Chaine *a.* Wilson.

thority, it will be found to designate either the tutelary deity of the hearth, or the only home of the family.*

In either sense Norwalk constituted the *Larem* of the defendants.

So all that we can gather from the papers before us, as to the mass of his fortune (*summam fortunarum*), indicates the possession of a homestead in Norwalk, while his floating· capital was in New York, in the midst of agitation and peril. In the fall of 1857 " his commercial embarrassments began," and we may infer from the result that such capital was inadequate to meet his debts.

Then it was that the deed of the homestead to his son was recorded, and then the advice to remove his family to New York was given and acted upon.

I may also refer to the comprehensive statement of the *legal meaning* of the term in an eminent French author : " They who have no intention of fixing their domicile in a place, but are absent somewhere for convenience, necessity, or business, cannot, by any lapse of time, create a domicile; neither the intention without the fact, nor the fact without the intention, is sufficient for this." (*D. Argentie*, art. ·9, § 4, cited by *Phillimore on Domicile*, p. 11, *Law Library*, vol. 41.)

I do not think that this subject can be properly treated without adverting to the important decisions in admiralty respecting the residence of a citizen· in an enemy's country, to subject his property to seizure and condemnation in time of war. The authorities before Sir William Scott are all cited and commented upon in the great case of The Venus (8 *Cranch R.*, 253), in the opinions of Justice Washington and Chief-justice Marshall.

It is sufficient for me to say, that the governing rule was admitted to be the removing from an established domicile, with the

---

* *Dii penates meûm parentum familiæque Lar pater, vobis mando ; meûm parentum rem bene ut tutemini : ego·mihi, alios deos penates, persequar, alium Larem.*—(Plautus.) *Laribus in foco, penatralibus in atrio, aut interiore œdium parte sacra fiebant.*—(Ib.) *Omnium œdium ac familiarum dii erant ; iisque focus peculiariter sacer erat.*—(Forcellini, Lexicon, in Verbo.)

*Illos binas, aut amplius domos continuare, nobis larem familiarem nusquam ullum esse.*—(Sallust.)

The definition *Domicilium* in the Dictionary of *Forcellini et cura Facciolati* is, *Domus, Ædes, Domestica Habitatio.*—(In Verbo.)

intention of making a permanent settlement, or for an indefinite time elsewhere. With such an intention the right of the domicile might be acquired upon a residence of even a few days. It was admitted in the case that the claimants had acquired a right of domicile in Great Britain, at the time of the breaking out of the war; and thus the question was, What was the consequence of the capture of such a person's property on the high seas?

I think that upon the application of the leading principles and cases I have thus referred to, the legal conclusion is, that the defendant Wilson was not a resident of New York at the date of these attachments.

Through all the periods of his business prosperity, we find his domestic hearth and his household comforts at Norwalk, his hopes of the enjoyment of the fruits of his labor there concentrated : in adversity, we find that he turns to the same place for respite and repose. It is only when the struggle with hostile fortune had begun, and the apprehension arose that his property might be swept away from the purposes to which he might wish to destine it, that he brought his family to reside temporarily in New York.

It is impossible, I think, to look upon him as more than a sojourner in this city, with no intention of remaining there fixedly; but with an intention, in all the vicissitudes of his business and of life, of permanently resting at Norwalk.

The motion to discharge the attachments must be denied, with $7 costs in each case.

From the order entered on this decision, the defendants appealed to the general term.

*James T. Brady*, for the appellants.—I. Wilson was not, when either of the attachments issued against him, a " *non-resident*" of this State within the meaning of the Code. 1. The word " residence" should, in construing the Code, be deemed synonymous with "domicile." 2. "Domicile" we define to be synonymous with " home," and to mean one's " habitation fixed in any place, without any present intention of removing therefrom." (Putnam a. Johnson, 10 *Mass.*, 488.) 3. " Removing," as thus used, means removing with the intent to change the place of

domicile. 4. "Residence" and "domicile" have been treated as of different significations, the former being sometimes taken to mean the place where one was staying, without having a domicile or home there. The latter is the sense in which it is used by the Supreme Court of this State in the decisions under the Revised Statutes, and Non-imprisonment Act. 5. It is not necessary, in order to render any place one's "domicile," that he or she should have any particular house or apartment there as the place of fixed abode. (Parsonsfield *a.* Perkins, 2 *Greenl.*, 411.) 6. "Every person must have a domicile somewhere." (Abingdon *a.* N. Bridgwater, 23 *Pick.*, 170.) 7. The intent of the party, when ascertained, tends strongly to establish where his domicile is. (Milton *a.* Falmouth, 3 *Shep.*, 479.) 8. A domicile once fixed will continue, notwithstanding the absence of a party, until a new domicile is acquired. (Jennison *a.* Hapgood, 10 *Pick.*, 377.) 9. That a party goes away from his domicile for some purpose of business or pleasure, or if he be absent for years seeking employment, or engaged otherwise, does not change his domicile. (Knox *a.* Waldoborough, 3 *Greenl.*, 455.) 10. The domicile of the wife follows that of her husband. (Greene *a.* Greene, 11 *Pick.*, 410.) 11. The fact that a man does not remove his family to the place where he establishes a domicile, does not affect a question like the one here presented, if as to *him* the proof of domicile is satisfactory. (Cambridge *a.* Charlestown, 13 *Mass.*, 501; Cadwallader *a.* Howell, 2 *Harr.*, 138.)

II. The process of attachment against the property of a non-resident debtor was originally given, because he could not be served with the ordinary process of the courts, so as to make a judgment against him effective. And before the Code it operated to place his property in the hands of trustees, to be distributed for the benefit of such creditors as might claim the benefit of the proceeding.

III. The Supreme Court for that reason held that an attachment would lie where a debtor was sojourning out of the jurisdiction of our courts, although his domicile was within this State. The word "residence" was in those adjudications taken to mean the place of his personal abode merely. (Matter of Thompson, 1 *Wend.*, 43 ; Matter of Wrigley, 8 *Ib.*, 134; Frost *a.* Brisbain, 19 *Ib.*, 11.)

IV. But under the decisions before the Code, Wilson was a resident of this State when the attachments issued, within even the liberal rule, then applied to proceedings of this nature.

V. Under the Code ample provision is made for commencing suits against absent or non-resident debtors. They are thus made amenable to our courts, and the former reason for the remedy by attachment no longer remains. It is not now a proceeding for creditors generally, but a special remedy for the benefit of the vigilant plaintiff who adopts it, and to be awarded only when he makes out a case justifying this peculiar relief. (Houghton *a.* Auld, 16 *How. Pr. R.*, 78.)

VI. There is no proof that Wilson was a "non-resident" of the State of New York, between the 12th October, 1857, and the 2d July, 1858. The contrary is shown. 1. To settle the question as to his residence, he formed the intention which Hendricks proves to give every ostensible evidence that his domicile was in New York city. And although one of his objects in doing so was to avoid attachments, it is not correct to conclude that he came "*not* with a full intention to fix himself permanently in New York." The evidence does not justify this conclusion. Mr. Wilson shows that New York was the place he designed for his home, and that the only reason he remained in a hotel, was the desire to occupy no house with his family until he owned it. 2. He engaged rooms at the St. Nicholas, as his home, and thither removed his entire household. He ceased to be the temporary or occasional guest of his son Oliver, and became master of a tenement. Thus, upon every authority affecting a question like the present, he fixed his domicile and residence here. And can there be any doubt that if the attachment laws of Connecticut had been the same as ours, any property he owned in the latter State might have been attached there on a procedure against him as a non-resident. 3. Having thus obtained a domicile in New York, it remained there unless he changed it, and obtained one elsewhere. (See, generally, 2 *Parsons on Contr.*, 90 ; 1 *Binney*, 340, *note.*) 4. He did not make such change. It is true that when the two attachments issued, one in April and the other in May, Wilson's *person* was in Norwalk. But he was not there with an intention to remain there. He swears, and there is no contradiction on the point, that he was unable to resume business until the latter part of May.

This was because of his very severe illness, which began in January, 1858. It is also true that the rooms at the St. Nicholas were given up when he went to Norwalk, in January. But this does not vary the question. If he had retained those rooms it would have been a useless expense. It was not the *St. Nicholas Hotel* which was his domicile, but the *city of New York*. And if he had changed his lodgings every night, this would not have altered his " domicile" in the contemplation of law. That Wilson's domicile was in New York in November, 1857, is shown by an act, indicative of intent, to which the law attaches much importance. He voted at the mayoralty election held in that city during that month. (Shelton *a.* Tiffin, *How.* (*U. S.*), 185.) We have then, to show that Wilson was a resident of and domiciled in New York, from October, 1857, until all the attachments had been issued, the following facts :

1. His business and property of every kind were in New York, and always had been, since 1856.

2. He had no tenement or habitation in Norwalk. When there he was a mere guest of his son.

3. He came here from Norwalk to make his " home" here, and so declared.

4. It was his interest to continue his residence here, so as to avoid an attachment of his property.

5. He returned here as soon as his health would permit, after his temporary absence from January to May.

6. After returning, he remained here with the continued intent to reside here. And he was no more a resident of Norwalk than of Saratoga, where he went for the benefit of his health.

VII. As to the three attachments issued in June and July, it seems quite clear, that when they issued Wilson was not a non-resident of this State; for in the latter part of May he returned here and remained here ever since. If, therefore, the rules apply in this case which prevailed under the Revised Statutes and non-imprisonment act, then, as Wilson was actually within the jurisdiction of the court, no attachment could issue against him.

VIII. None of the authorities cited in the able and elaborate opinion of Judge Hoffman vary the effect of the reasoning and cases cited under the foregoing points. 1.° The question of " domicile" for purposes connected with the national, ecclesias-

tical, or maritime law is affected by peculiar views which have not been adopted in the common law; but which, if applied in this case, would not make Norwalk the domicile of Wilson. 2. The case of Barry a. Backover (6 *Abbotts' Pr. R.*, 374), like many others, is one in which the defendant sought to establish, that although *domiciled out of the State*, yet having his business *in this State*, he was to be regarded as *resident* here in all cases of attachment. This view seems to have been sustained by the Supreme Court in Towner a. Church (2 *Abbotts' Pr. R.*, 299). 3. It is believed that no case can be found in which it has been held that the property of a person can be attached in this State, on the ground of his being a non-resident, where, as in this instance, his business and property were here alone, and he came here to reside, and did reside here, except at intervals, when affection or illness called him away, or prevented his return here after a temporary sojourn elsewhere.

IX. Two circumstances were dwelt upon by the plaintiffs as against our views. 1. As to Wilson being named on the Norwalk poll-tax for 1858. There is no evidence that Wilson had any notice of this; and, at most, it is an act of others, which does not impair his right. 2. That Oliver Wilson did not put his deed on record until the fall of 1857. It was not necessary to record it sooner, either by law or because of any distrust a son could entertain towards his father. And it was only on the failure of the latter that it was deemed prudent to record the deed, so as to show more publicly who owned the property described in it.

*J. W. Edmonds*, with whom were *Buckham*, *Smales*, and *Greene*, for the respondents in four of the actions.—1. This is the ordinary case of a person doing business in New York, and being in the city only while his business required him here, and for all purposes of family or residence, living in Connecticut. 2. His avowed intention to be a resident in New York might serve to characterize a doubtful act, but is not enough to overthrow the fact of actual residence abroad. 3. The defendant was actually resident in Connecticut, within the meaning of the Code and of the various cases on this subject. (Roosevelt a. Kellogg, 20 *Johns.*, 208; Matter of Wrigley, 4 *Wend.*, 602; S. C., in Error, 8 *Ib.*, 132; Frost a. Brisbin, 19 *Ib.*, 11; Crawford a.

Wilson, 4 *Ib.*, 505 ; *Drake on Attachments*, § 67 ; Houghton *a.* Ault, 16 *How. Pr. R.*, 78 (supra, 89, *note*) ; Barry *a.* Backover, 6 *Abbotts' Pr. R.*, 374.)

*David Dudley Field*, for the respondents in the other action, cited, in addition to the above authorities, 1 *Bradf.*, 85, 90 ; *Code*, §§ 33, 125, 135, 292, and 391.

By the Court.*—Woodruff, J.—We held in the case of Barry *a.* Backover, at the general term of April, 1858, that a defendant whose family have for more than seven years occupied, and still occupy, a dwelling in Jersey City, in the State of New Jersey, hired by him, and who habitually passes the night of each day and the Sabbath with his family, is a non-resident of this State, within the meaning of our present statute authorizing an attachment of the property of a defendant in an action, although such defendant was engaged in business as a merchant in this city, spent eight hours of every business day (unless sick or absent on business of his mercantile firm) in this city ; had all his business capital invested in such business ; kept his individual bank account here ; and had selected New Jersey as his family residence solely on account of its convenience for access to the business portion of this city, and for economy in living ; and, notwithstanding process in the action, might at any time within the business hours of the day, have been served upon personally, and was in fact served upon him in the action in which the attachment was issued.

It is therefore to be deemed settled in this court, that the right of a plaintiff to have the property of a defendant attached on the ground of his non-residence, does not depend upon the question whether the defendant can be served with the summons in the action, but that the attachment may issue, however convenient it may be to serve the defendant personally with process.

Also, that the carrying on of a mercantile business in this city, and staying within our limits for the purposes of business, during all the hours usually devoted to business here, do not

* Present all the Justices.

alone constitute residence within the meaning of the statute. And it follows as a necessary consequence of this proposition, and is involved in the principle of the ruling, that, whether a man's absence from his family be for eight hours in each day, or six days in each week, if he has a family living in a neighboring State, for whom he provides, to whom he resorts for comfort, relaxation, and repose, and with whom he abides whenever the immediate demands of his business upon his attention will permit; whenever sickness disables him from conducting that business; and when those days successively return on which business ceases and man rests from his labor; he resides in such neighboring State, where (in every proper sense, as understood no less by those who are learned in the law, than by the common intelligence of every-day life) is his home.

We did not deem it necessary for the purposes of that case, and do not deem it necessary for the purposes of the present, to review or recite the various learning to be found in the books upon the question, how far residence and domicile are synonymous, or how, in certain cases, they differ.

In the case above referred to, the State of New Jersey was the defendant's domicile, within every definition of that term, and it was not less clearly his residence. It was his abiding-place : he left it with intent to return so soon as his labors were remitted : he returned to it with intent to remain until called to resume those labors. New York was his place of business, New Jersey his place of abode. In New York was his workshop. In New Jersey was his house, his shelter, his fireside, his bed and board. We know of no definition of either domicile or residence which the former will satisfy, nor of any in which the latter will not answer in every particular.

And for like reasons we did not then, and do not now, think it necessary to review the cases in this State in which a man has been held a non-resident within the " spirit" of our former statutes, who has an actual residence out of the State, though he have a family within this State, or have a domicile here. (See those cases collected and discussed by Mr. Justice James in 16 *How. Pr. R.*, 77, and further by Mr. Justice Hoffman at special term in this case.) That long-continued absence in a fixed location, carrying on a business permanent in its nature ; or long-continued absence in such location for the purposes of

business, the duration of which was uncertain; or absence for several months, in pursuance of an intention to make a permanent location for residence and for business, and an actual location and commencement of such business, though the removal of the family have not yet taken place—should be held to constitute non-residence within the spirit of those statutes, prove nothing in reference to such a case as the one above referred to: the question of their present actual residence was the question considered in those cases, and was decided in favor of the attaching creditor.

But in no case has it been decided that where the debtor lives with his family in this State, returning to them from day to day, or from week to week, he is an actual non-resident (even within the "spirit" of any law touching non-residents), merely because he passes the business hours of the day, or the business days of the week, when his health will permit, and his business requires it, in his store or manufactory without the bounds of the State.

In such a case the liability of the party to taxation, to render service as a juror, or to enrolment as one of the militia, we apprehend would not be seriously questioned.

Ordinarily one's residence and domicile (if they do not always mean the same thing) are in fact the same, and where they so concur they are that place which we all mean when we speak of one's *home*.

And it may safely be asserted that where one has a *home*, as that term is ordinarily used and understood among men, and he habitually resorts to that place for comfort, rest, and relaxation from the cares of business and restoration to health, and there abides in the intervals when business does not call—that is his residence, both in the common and legal meaning of the term. And to one who has such a home, and habitually uses it as such, a place of business elsewhere, is not his residence within any proper definition of the term.

When the question, where is his residence, arises, some of the proofs, or the indicia by which the place is. to be determined, vary with the circumstances of the party. One has a family, another has none; one lives in a state of alienation and separation from his family, another lives with them; one owns or hires a dwelling-house, another has lodgings at an inn; and another

may have a much more uncertain shelter. None of these circumstances are necessarily alone conclusive—they are not decisive tests—they are only aids to an answer to the question to be considered in connection with all other pertinent facts which may appear.

So when the fact of residence in a place is ascertained or conceded, it is to be deemed to continue until there is proof of a change of location, with intent to make such location a new home, in the sense above already described, not merely for a temporary purpose, but with a fixed purpose to remain, and without a present intention to return when some temporary purpose is accomplished.

And again, it is not enough that one intends to change his residence. The intent and the fact of such change must concur. Nor is it enough that he intends to change his residence, and sincerely believes that what he has done amounts in law to a change of his residence, his opinion will not affect the question, if the actual change have not taken place.

Enough has now been said (and probably more than enough) to make our views of the case before us intelligible.

The defendant Wilson was confessedly a resident of Norwalk, in the State of Connecticut, in the year 1856.

It will throw light upon the proper weight to be given to his affidavit (upon which the claim to discharge the attachment mainly depends), if it be noticed, that he states that he then "resolved to become a permanent resident of the city of New York," and that he further states that "during the whole and any part of the year 1856, and so much of the year 1858 as has elapsed, he has been and now is a resident of the State of New York."

What then did he do in 1857 which made him a resident of the State of New York? The answer to this question may perhaps aid us not only in determining what he means when he swears to residence, and what sort of sojourn in New York he *intended* by what he calls a resolution to become a permanent resident, and what he understands and means by "*permanent residence*."

He left his family in Norwalk on the farm theretofore occupied by them, came to New York on Monday, devoted himself to his business here, sometimes until Wednesday, and then re-

turning to his family, and again returning to New York on Thursday—but usually staying in New York until Saturday, and then returning to his family in Norwalk,—while in the city boarding at a hotel as an ordinary guest, and occupying a bed-room only—and this continued until the fall of 1857.

After what has been already said of such a course and habit of life, it is only necessary to add, that this neither in fact nor in law made him a resident of the city of New York. And if we assume that in doing this he did, what he states he resolved to do, we see what he means when he says he resolved to become a " permanent resident" of the city of New York.

In this there is no doubt intimated of Mr. Wilson's sincerity. On the contrary, the more since he is, and the more confidently he insists that he was a resident of New York at that time, the more probable it is that his apprehension of the force and mean-ing of the terms employed in his affidavit is inaccurate, and that if he had explained in detail what he means by " permanent" and " temporary," " home" and " residence ;" or rather if he had given us the particulars embraced in those words, instead of testifying in terms, which, if taken in their legal signification, dispose of the whole question upon his mere opinion, it might have appeared that his affidavit is not less inaccurate in other respects, by reason of similar mistakes in his judgment on the subject.

He was then a resident of Norwalk down to the time of his failure or embarrassment in business in the fall of 1857; and he was then admonished by a friend that he might be deemed a non-resident, and it was best to establish " the ostensible as well as actual character of his residence by unequivocal indications." It is doubtless true, that the motive with which a change of resi-dence is made, is wholly immaterial, if the change be an actual change, with intent permanently to abide in the new location. But in weighing the evidence, and where there is a conflict of testimony and circumstances detracting from the evidence of the alleged change, the motive under which the party is acting, and the purpose he has in view, may properly be regarded in deter-mining what was the actual intent.

The question we are considering is not whether, if he intended an actual " permanent residence" in New York, and in pursu-ance of that intent brought his family here; took possession of

· apartments here as his and their " only home," and occupied them without any intention to return to Norwalk when a temporary purpose was accomplished, that would make him a resident of this city?   But the very question is, what was his intent in these respects, and what did he do?

He conveyed his farm and the chattels connected therewith to his son, and when he became embarrassed the deed was placed on record.   But that farm has been as open to him and to his family, and has been as freely used as a home to him and them, according to his own affidavit, as it ever was before.   Whether his wife's farm is still retained, or whether that is the farm referred to, is left in doubt by the affidavits.

He took rooms in October, 1857, at a hotel in this city, and with his wife and child, occupied them for three months, paying his bills weekly, but then gave up the apartments, and has not since had any permanent apartment in the hotel; nor does it appear that he was in the city at all afterwards, until after one, if not two of the attachments were issued which it is moved to discharge.

It is shown that his child was sick; and *that*, under the advice of his physicians, was a sufficient reason for taking him from the city.   So, also, that Mr. Wilson was sick; and *that*, if he was too ill to be removed, was a very satisfactory reason for his not returning until sufficiently recovered.   But it is not shown that his child continued ill—nor that he himself might not have returned, if in truth this was his home.   Such continued absence would, however, under the circumstances, be far less significant if it were not, that, according to the tenor of his own affidavit, that of Mr. Hendricks, and that of his physician, it is apparent that it was because he had no motive to be here; either because he could not attend to business, or because his firm had suspended payment, and his presence in the city was not deemed so important as it had been on former occasions.   And since the month of May, when he has been able to attend to his affairs, he has been merely an occasional transient lodger at the hotel—his family residing at Norwalk.

The indication is not slight, that the purpose under which his family were brought to the hotel, was to continue here only until the embarrassments of his firm had ceased, and with an expectation of their returning to Norwalk, or, if any more pro-

tracted stay was contemplated, that the design was abandoned some time before these attachments were issued; and that his subsequent visits to the city were only occasional and for purposes of business, while his actual residence was with his family at Norwalk.

There are other statements in Mr. Wilson's affidavit which tend strongly to support the motion for the discharge of the attachments, and it is doubtless true that if that affidavit is to be taken without qualification, and in the very terms therein employed, it would prevail.

Among the other statements, is one, that his wife and child returned to New York in March, and resumed the apartments they had before occupied. With what intent and purpose did they come? How long did they propose to remain? How long did they in fact remain? His affidavit does not inform us.

He states that when he and his family left in January, some of their personal property was left there. What property? How far did its character indicate an intention to return? His affidavit is silent on this subject. While another witness states that he gave up his apartments, and neither he nor his family have ever had any permanent apartments there since.

Is it usual for actual residents to have no house nor apartments, by a tenure more permanent than to take and occupy from time to time such rooms as happen at the moment to be vacant at a hotel? Probably we cannot say that it is not, and yet we cannot avoid the feeling of surprise, if it be so.

So, also, he states that it has long been his resolution not to occupy a house in New York until he owned one, and he has conferred with several of his friends, and made efforts to obtain an eligible property in the city, wherein to have himself and his family permanently established. At what time, during the long period here mentioned, did he make these efforts? Was it before he went to Norwalk to reside? With whom did he confer? What were the efforts which he made? And did he even in fact intend to purchase a house here, and if so, when did he have such an intention?

It would seem strange that in relation to a fact so important as this on the question of a change of residence, some, at least, of these particulars have not been disclosed.

The review thus given of the affidavit of Mr. Wilson may,

perhaps, be deemed minute and critical. But it should be borne in mind that this is the main affidavit upon which the motion is founded—the motion is a very important one to all the parties—the affidavit comes from one who knows all the facts, and some of the facts stated relate to the operations of his own mind, and it is reasonable to expect, under such circumstances, and especially when a severe contest might well be anticipated, a statement less liable to abatement in the particulars above referred to.

We do not think it necessary to give a recital of the details found in the numerous affidavits read in opposition to the motion. They tend to show the habits of Mr. Wilson, not only down to 1857, but since,—down to the time when the motion was noticed, bearing on the question of residence, and without apparent change in that respect: the belief of his neighbors and acquaintances in Norwalk founded thereon, or derived from their acquaintance with him: the efforts made to find him in this city: the apparently transient character of his lodging at the hotels here, from time to time: the general reputation at Norwalk induced by his habitual actual presence there, as in former years: the action of the public officers there, based upon all the circumstances; and other particulars of less moment.

On the other hand, Mr. Wilson is corroborated in some particulars of an opposite tendency.

Without entering into any further detailed discussion of the particulars of these affidavits, it must suffice to say that, upon a careful examination of all the affidavits, we are not satisfied that the conclusion of the judge, at special term, that, as matter of fact, Mr. Wilson was a resident of the State of Connecticut when these attachments were issued, was clearly wrong.

The controversy is rather about facts than about the legal principles involved. As to the meaning of the term residence or non-residence, in reference to this motion, we think there is no ground for difference.

We are sitting as an appellate tribunal, upon a question of facts arising on conflicting affidavits and doubtful circumstances. We should not reverse an order, unless clearly satisfied that the finding of the judge was wrong. We incline rather to the opinion that, sitting as jurors and acting under instructions touching

Chaine *a.* Wilson.

the law, such as we deem the law to require, we should come to the same conclusion.

The order should be affirmed.

PIERREPONT, J., dissenting.—In these five cases attachments were issued out of this court against the property of the defendant Wilson as a non-resident; they were dated respectively, April the 13th, May the 23d, June the 4th, and July the 1st, in the year 1858. A motion was made at the special term to discharge these attachments, and on the 12th day of October, 1858, an order was entered denying the motion. From that order this appeal is taken.

The question is, whether the defendant was, or was not a resident of this State at the time of the attachments:

The defendant has a wife and family: such person is a resident of the place in which he has fixed his abode with the intention of remaining in it as his home, without any present purpose of removing therefrom.

Temporary sojourn for business, health, or pleasure does not constitute residence.

The *animus* and the *actum* are both important in the consideration of this subject.

Any person has a *right* to change his residence, be his motives what they may; and when the *animus et actum* concur, that moment the residence is fixed or abandoned, and the legal rights and disabilities attach accordingly.

A resident of New York, indignant at the high taxation of his property, determines to remove to Norwalk, in the State of Connecticut to avoid this taxation; he takes his family to Norwalk and hires rooms at the village tavern which they occupy; and though he looks after his affairs in the city during the week, he spends every Sunday with his family, and gives out that Norwalk is his home, that he is no longer a resident of New York, and avows that he has changed his residence for the sole purpose of avoiding taxation. An attachment issues against him as a non-resident. On motion to discharge it, he shows that he is engaged in business in this city, where process could be served upon him during every week-day; that he is a lawyer or merchant in regular employment here, and changed the home of his family only to avoid taxation. I apprehend the motion would

be denied.   Thus finding that escape from taxation has sub-
jected him to the annoyance of attachments, he resolves to
change his residence again, and removes his family from the
village tavern to the St. Nicholas Hotel.   His real and avowed
purpose in the former change was to escape taxation,—in the
latter, to avoid attachments; both objects are legitimate and
within the sphere of his rights.   In each case the *animus et
actum* concur, and forthwith subject him to all the legal conse-
quences of this change of residence.

If these views are correct, this case will be disposed of so
soon as we ascertain whether the defendant changed his resi-
dence from Norwalk to New York prior to the attachments;
and whether if he did make such change of residence, he had
abandoned the same before the attachments issued.

Residence being once established in any given place, it is in-
cumbent upon the party seeking to avail himself of a change of
residence from that place, to *prove* such change.

In this case the defendant's residence from 1840 to 1856 be-
ing conceded to have been in Norwalk, the burden was thrown
upon him to prove a change to New York; and if that change
was conclusively proved, it threw the burden upon the plain-
tiffs to show that the residence of the defendant was changed
back again to Norwalk.

*First.* Is the evidence satisfactory that the defendant changed
his residence from Norwalk to New York in the autumn of
1857 ?

The defendant. *knows* more of his own acts and intentions
than any one else can possibly know; and by well-settled rules
of law, his sworn statements are to be taken as true, unless con-
tradicted by other witnesses, disproved by attendant circum-
stances, or rendered incredible by *some* legitimate evidence.

[Here the contents of the affidavits given above were stated.]

Aside from expressions of opinion on the defendant's part,
these affidavits present the case of a merchant who had retired
from business in the city of New York, who had for some years
prior to 1856 resided upon a farm in the village of Norwalk,
and who resolved in the year 1856 to become a permanent resi-
dent of this city.   In that year he conveyed the farm and all
his property in Norwalk to his son Oliver, who then attained
his majority, and who has held the same exclusively as his own

from that time to this. The defendant thereupon became a permanent boarder at the Astor House, engaged in active business here, leaving his wife and minor child at Norwalk, with his son Oliver, visiting them every Saturday, and returning on the Mondays following, intending in this way to change his legal residence to New York, and supposing that he had done so.

In the fall of 1857 his commercial house in this city, where all his business was done, and in which all his fortunes were intrusted, became embarrassed, and it was suggested to him by his confidential clerk that some question might arise as to his legal residence, growing out of the absence of his family, at which suggestion he expressed the confident declaration that he was a resident of this State. But to avoid the possibility of any difficulty on that subject, he engaged for himself and family apartments at the St. Nicholas Hotel, and with his family took possession of the same on the 12th day of October, 1857, and there remained until the 22d day of January, 1858, when his child became ill, and the two physicians who attended him advised that the child should be taken to the country for the benefit of its health. Following this medical advice, the wife of the defendant, to recover the child's health (and for no other reason), went back to Norwalk to the house of her son Oliver.

A few days afterwards the defendant went to see his child, intending the visit to be but temporary ; while there he became ill, and was detained by illness until the latter part of May of the same year,—entertaining no other idea than that he was a resident of New York, where he had gone permanently to reside, where he had voted at the November election for mayor, and having no intention to abandon that residence.

In March, 1858, the defendant's wife and child returned to the St. Nicholas Hotel, and resumed the apartments which they had before occupied, the defendant promising and expecting to follow them in a few days, which illness alone prevented. , Personal property of some kind had been left at the hotel by the defendant, from the intent and design of resuming possession of the apartments after the contemplated return from their visit to Norwalk.

The defendant returned to the city in May, and has remained here ever since, except only occasional temporary absence for health or pleasure, and having in good faith supposed himself a

resident of this city, where he had made various efforts to obtain property wherein to have himself and his family permanently established.

This I conceive to be a fair statement of the defendant's case, as presented by his proofs, supposing them to stand alone, unimpeached and uncontradicted. And if upon this evidence only, we were sitting in Connecticut under precisely similar attachment laws, and a motion were made to discharge this attachment on the ground that the defendant was a resident of Norwalk, and not of New York, I think we should not hesitate to decide that he was a *non-resident* of Norwalk, and deny the motion.

*Next.* Let us see in what manner and to what extent the defendant's case is weakened by the plaintiffs' evidence.

The plaintiffs have introduced a large number of affidavits: some made by clerks of the Astor House and St. Nicholas Hotel, and many by residents of Norwalk. These witnesses confirm the defendant's statement relating to the time when he was at the hotel, and when he and his family were at Norwalk. They show that his conveyance to his son Oliver is true; they show that he voted in Norwalk in the fall of 1856, but at no time since; that he was on the poll-tax list in 1857 and 1858, but not that he ever paid any tax after 1856; that he was regarded as a resident of Norwalk by the witnesses and others; but no one of them suggests that the defendant, after 1856—when he conveyed to his son—ever said that he was, or that he considered himself, a resident of Norwalk. These witnesses, appearing to have had no personal acquaintance with Mr. Wilson, say that they considered him a resident; while Dr. Gregory, the resident physician of the village, and whose opportunities of knowledge seem to have been good, states,—" that he believed and looked upon the defendant as being a citizen and resident of New York for the last three years, or since he sold and conveyed his homestead property in Norwalk to his son; that said Wilson was not in the habit of attending town-meetings or elections in Connecticut after he conveyed his said property to his son."

The merchant, lawyer, banker, or other citizen of New York, who, for health, pleasure, or business, goes to Kentucky or to Europe in the spring, intending to return in the fall, does not thereby lose his residence and subject his property to attachment;

nor does it matter whether he takes any part of, or his entire family with him, *the fact being ascertained that his absence is intended to be but temporary.* Nor is the case altered by a misfortune of illness, which may detain him much longer than he at first anticipated.

I quite agree with the legal views expressed by the learned judge below, and cite his able opinion, as containing a true exposition of the law. But in examining the evidence of this case, I suspect he has given more weight to the defendant's motive in removal to New York than it justly deserves. As before remarked, the motive of a man, engaged in business here, to return to the city to avoid attachments, is just as legitimate as his motive in going to the country to escape taxation ; neither are of any consequence, except so far as they throw light upon the *bona fides* of the intention to change residence.

The defendant's affidavit is criticised by the plaintiffs' counsel as defective in *particulars,* and that consideration was much pressed upon the court. ·

The natural expression of conscious truth is straightforward, positive, and to the point. Heretofore, extreme formalities and particularities in the affairs of men have been regarded as *indicia* of fraud.

One man says to another—" I have changed my residence from Norwalk to New York ; I am now with my family at the St. Nicholas Hotel ; I intend to get a house of my own wherein to remain permanently ; I have made various efforts to purchase one, but have not yet succeeded." It strikes me such would be a very natural way of asserting a simple truth. But if the person should give every minute particular ; tell with whom he had talked, what he said, when he said it, where he said it, what property he had seen, with whom he had negotiated, when he was there, at whose office, where the office was, and what the broker said, &c., that very particularity would create distrust— it would be unusual and unnatural, and it is not the way of honest truth.

I have not forgotten, that where affidavits are long, counsel reject very many of the particulars which the client states, under the apprehension that the main facts will be smothered by a crowd of things of lesser importance ; and that thus the *court* will be in danger of overlooking the substantial points of the

case. My intercourse with men has not led me to believe that an eminent merchant will perjure himself for the purpose of making equal distributions of his estate among all his creditors, nor that respectable counsel will write out an affidavit so strong and positive in its terms, and so *unmistakably* calculated to mislead the court, unless he believed from *all* the statements of his client, that the affidavit embodied the true meaning of what the client said.

That a boy eight years old, brought up from the country in October, and shut up in the St. Nicholas Hotel until the 22d day of January following, should get sick, and that the physicians should advise a change to the country for restoration, is not strange ; and that the father, overwhelmed by misfortunes, should send the boy to the home of his other son seems natural, and not necessarily to indicate any change of purpose as to residence in New York.

At the hearing, I considered this case with much care, and with a single desire to get at the truth ; and a re-examination of *all* the testimony has left a firm conviction upon my mind, that the *clear*, *positive*, and *unequivocal* statements of the defendant, under solemn oath, ought not to be discredited by any evidence which this case presents.

All the other justices concurred in the opinion of Mr. Justice Woodruff.

Order affirmed, with costs.

---

## WILLINS a. WHEELER.

*Supreme Court, Second District : General Term, February*, 1859.

JURISDICTION OF JUSTICES' COURTS.—APPEAL.—ERROR OF FACT
DETERMINED ON AFFIDAVIT.

A non-resident, sued in a justice's court by long summons, on the return day appeared before the justice, and after stating that he did not appear in the action, that he was a non-resident, and declined further to plead, he left the courtroom. The plaintiff obtained an adjournment, and on the adjourned day took